AIRWICK INDUSTRIES, INC., *ET ALS.*, PLAINTIFFS-APPELLANTS, CROSS-RESPONDENTS, v. CARLSTADT SEWERAGE AUTHORITY, *ET ALS.*, DEFENDANTS-RESPONDENTS, CROSS-APPELLANTS.

Argued June 1 and 2, 1970—Decided October 26, 1970.

Mr. *Allan H. Klinger* argued the cause for plaintiffs-appellants, cross-respondents (*Messrs. Calissi, Gelman, Cuccio and Klinger,* attorneys).

Mr. *Alfred A. Porro, Jr.* argued the cause for defendants-respondents, cross-appellants (*Mr. Alfred A. Porro, Jr.,* attorney for defendant-respondent, cross-appellant, Carlstadt Sewerage Authority; *Mr. Gene N. Schiffman,* attorney for defendant-respondent, cross-appellant, The Borough of Carlstadt).

The opinion of the court was delivered by

HANEMAN, J. This appeal concerns the extent of the area of the Borough of Carlstadt (Carlstadt) over which the Carlstadt Sewerage Authority (Authority), created under *N. J. S. A.* 40:14A–1 *et seq.,* has jurisdiction and the legality of the sewerage rates set by said Authority.

In 1938 Carlstadt by contract with Rutherford and East Rutherford created a "Joint Meeting," "for the purpose of collecting and treating the sewage from the western section of the three Boroughs." See *N. J. S. A.* 40:63–68 *et seq.* The Joint Meeting constructed a sewage treatment plant between the years 1939 and 1941. The users of the sewer service are not directly charged for such service, the cost of operation, maintenance, etc., being distributed among the three municipalities. The proportionate share of Carlstadt is absorbed by revenues raised by general taxation.

The eastern section of Carlstadt is largely "meadowland," which for years remained undeveloped and unsewered. Due to recent rapid development, largely industrial and commercial, it became apparent that some general system of sewage disposal was required to avoid the imminent danger of water pollution. Accordingly, Carlstadt obtained field investigations and studies from a firm of consulting engineers. As a result, Carlstadt determined that the method of sewage disposal in that section was inadequate. It also concluded that sufficient addition to its present system or

construction of a new system would create an almost insuperable municipal financial problem. The Borough, therefore, created the Carlstadt Sewerage Authority. See *N. J. S. A.* 40:14A–1 *et seq.* On July 1, 1967, Carlstadt entered into a service agreement with the Authority. In this contract the word "district" is defined, using the language of *N. J. S. A.* 40:14A–3, as "the area within the boundaries of the Borough." However, the system which the Authority was to finance and construct was referred to in the contract as "for the use of the residents and inhabitants of a *portion of the* Borough and for the collection and disposal of certain sanitary sewage and other wastes arising within a *portion* of said District." (Emphasis supplied)

The planned system includes the construction of collection sewers, pumping stations and force mains to connect with the sewerage system of the Bergen County Sewer Authority which ultimately treats the sewage in its treatment plant in Little Ferry. The scheme for establishment of the sewage collection system by the Authority contemplates construction in two stages to serve approximately 650 acres of the Borough. Stage I is designed to serve approximately 200 acres, containing some 55 industries at its inception, but to ultimately serve 90 industries. Stage II will serve approximately 450 additional acres, with 63 industries to be served initially and 220 industries ultimately.

The system was constructed with funds obtained from the proceeds of a bond issue of the Authority in the amount of $5,800,000. The construction of the system was completed and allegedly available in Stage I on November 1, 1968.

On July 27, 1967, the Authority adopted a "Schedule of Sewer Service Charges" which schedule was revised on April 11, 1968 to provide the following charges:

SCHEDULE OF SERVICE CHARGES

| Nature of Charge | Industrial-Commercial |
| --- | --- |
| Connection Fee | $1500.00 if connected within one year from the date of availability of said sewerage system to |

the premises; $3000.00 if connected within the second year of the date of notification of availability; $4500.00 if connected within the third year of the date of notification of availability; $5,000.00 if connected any time after the third year of notification of availability of said sewer.

Residential

$150.00 if connected within one year from the date of availability of said sewerage system to the premises; $300.00 if connected within the second year of the date of notification of availability; $450.00 if connected within the third year of the date of notification of availability; $500.00 if connected any time after the third year of notification of availability of said sewer.

| | |
|---|---|
| Capacity Charge: <br> (Per Annum) | Industrial-Commercial <br> & Residential |

10.5 cents per square foot of building constructed on premises being served or available to be served; a minimum capacity charge of $150.00 per year shall be charged.

| | |
|---|---|
| Use Charge: <br> (Per Annum) | Industrial-Commercial <br> & Residential |

$1.00 per thousand gallons.

On November 1, 1968, the Authority rendered bills for sewer servicing in accordance with the above April 11, 1968 revised schedule to all plaintiffs located in the geographic area served by Stage I.

41 of the 160 commercial and industrial users brought the present declaratory judgment action, contesting the validity of their sewer bills. Judgment was entered favoring in part both plaintiffs and defendants.

Plaintiffs appealed and defendants cross-appealed from portions of the judgment. Plaintiffs' motion for certification to this Court before argument in the Appellate Division was granted. See *R.* 2:12–2(a).

So much of the judgment as is here involved concerns the adjudication that: (1) It was within the power of the municipality to set up the Carlstadt Sewerage Authority within an area constituting only a part of the Borough (2) A charge based on "capacity of improvement," *i. e.,*

area of building, was improper due to the fact that it was not proportional. (3) The connection fees were valid only to the extent of one charge of $1,500 and anually increasing connection charges were invalid. (4) The plaintiffs were not estopped or barred by laches.

We shall consider the issues in the order above set forth.

I

*Does the division of the municipality into two sewer districts violate the terms of N. J. S. A. 40:14A–1 et seq., and the Fourteenth Amendment of the United States Constitution?*

*N. J. S. A.* 40:14A–3(6) provides in connection with the definition of 18 separate words and phrases:

"As used in this act, unless a different meaning clearly appears from the context:
\*       \*       \*       \*       \*       \*       \*       \*
"(6) Subject to the exceptions provided in section four of this act, 'district' shall mean the area within the territorial boundaries of the county, or of the municipality or municipalities, which created or joined in the creation of a sewerage authority;"

Plaintiffs argue that this statutory definition connotes that the jurisdiction of a Sewerage Authority encompasses the entire area of a municipality creating such an Authority, and that such an Authority has the sole right and duty to provide for sewage disposal within the municipality. From this premise they spring to the conclusion that the Joint Meeting no longer has the right or power to function in the western section of Carlstadt and that the sewer service in that portion of Carlstadt must be furnished by the Authority. They also conclude that Carlstadt may no longer constitutionally pay for such service out of general taxation but that the individual users of the system must pay the Authority. They do not suggest how or by what statutory authority the Joint Meeting can function under its tripartite contract absent any service to or financial participation by Carlstadt, nor what portion of the Joint Meeting debt, if

any, is to be assumed by the Authority, nor how and for what consideration Joint Meeting and Carlstadt are to transfer the existing sewer plant, lines and equipment.

They cite as a decisional support for the above, *Santoro v. So. Plainfield*, 57 *N. J. Super.* 307 (*Law Div.* 1959) aff'd 57 *N. J. Super.* 498 (*App. Div.* 1959). It must be remembered that what the court there said was articulated in connection with the facts there present. Involved, was not the question, as here, whether a municipality may, after creating its own sewer authority, continue to participate in the operation and maintenance of an existing sewer system in part of its territory. Rather, the inquiry was whether a municipality, having created a sewer authority, could subsequently construct a sewer system of its own without the consent of the authority. The court held, quite properly, that the municipality could not undertake this latter action in the light of *N. J. S. A.* 40:14A–29 which reads:

No sewage disposal plant or other facilities for the collection, treatment or disposal of sewage arising within a district shall be constructed unless the sewerage authority shall give its consent thereto and approve the plans and specifications therefor.

It is seen that the cited case is no authority for plaintiffs' proposition.

*Kline v. Bellmawr Sewerage Authority*, 55 *N. J. Super.* 153 (*Ch. Div.* 1959) aff'd *sub nom. Landy v. Bellmawr Sewerage Authority*, 61 *N. J. Super.* 396 (*App. Div.* 1960), also cited by plaintiffs, is no authority for their argument. In *Kline*, the municipality created a Sewerage Authority to which it "donated the [existing municipal] plant, mains, laterals, rights of way, and pumping stations and equipment," as it had the power to do under *N. J. S. A.* 40:14A–22, intending that the sole agency for sewage disposal should be the Sewerage Authority. The question of exclusive jurisdiction was not an issue.

That *N. J. S. A.* 40:14A–1 *et seq.* did not intend that the Authority must supersede and succeed to an existing

municipal sewer system is borne out by the various sections which (1) make it *permissive* for the municipality to "sell, lease, lend, or grant or convey * * * all or any part of any system of main, lateral or other sewers or other sewerage facilities" to a Sewerage Authority (*N. J. S. A.* 40:14A–22); (2) authorize a municipality to enter into a contract with a Sewerage Authority for "the treatment and disposal of sewage originating in the *district* or in such municipality by means of the sewerage system or any sewerage *facilities of such municipality* or both" (*N. J. S. A.* 40:14A–23) (Emphasis supplied); (3) authorize the Sewerage Authority "to enter upon and use * * * any existing public drains, sewers, conduits, pipe lines, pumping and ventilating stations and treatment plants or works or any other public property of a similar nature within the district" with the restriction that "No sewerage authority shall, however, take permanent possession or make permanent use of any such treatment plant or works unless it acquires the same." (*N. J. S. A.* 40:14A–25). Implicit in the foregoing is an intention to permit the continuance of an existing system and a recognition of the municipal power to continue to operate a system until voluntarily relinquished.

The following portion of the Statement of Purpose attached to the bill which became *N. J. S. A.* 40:14A–1 *et seq.* further supports the conclusion that no abolition of extant services was intended:

Another such *optional provision* would permit an arrangement whereby the authority, on *mutual agreement* between it and the municipality, would take responsibility for operating the entire sewer system of the municipality, *or some part thereof*, and assume all or part of the existing sewer debts of the municipality, thus further relieving the tax burden. (Emphasis supplied)

It is, therefore, concluded that the legislature intended that the municipality have the power to create an authority to service any portion of the municipal territory

and that where a sewerage system existed in some other portion of the municipality at the time of the creation of the Sewerage Authority, that system may continue to function and the services rendered be paid for other than through the Authority.

Plaintiffs also say that:

Denial of sewer service to persons owning or occupying property east of Berry's Creek in the Borough of Carlstadt on the same terms and conditions as the sewer service rendered to persons owning or occupying property west of Berry's Creek in the Borough of Carlstadt is a denial of the equal protection of the laws in contravention of the provisions of the Fourteenth Amendment to the United States Constitution, U. S. Constitution, 14 Amend.

By this argument, plaintiffs attack the payment of the costs of the Joint Meeting out of funds of Carlstadt raised by general taxation. Plaintiffs say that the money for the payment of these costs is in part absorbed by them through payment of their annual municipal tax levy. Accordingly, the actual users of the Joint Meeting sewerage system obtain the benefit of that payment while plaintiffs are simultaneously required individually to pay the Authority for their own sewerage system. They conclude that the users of the Joint Meeting system are unconstitutionally favored.

In *N. J. Chapt., Am. I. P. v. N. J. State Bd. of Prof. Planners,* 48 *N. J.* 581, 601 (1967), cert. denied 389 *U. S.* 8, 88 *S. Ct.* 70, 19 *L. Ed.* 2d 8 (1967), this Court said:

The constitutional mandate for equal protection does not mean that the regulation must reach every class to which it might be applied—that the Legislature must regulate all or none. The Legislature has wide discretion in the creation of or recognition of classes for different treatment. Equal protection does not require that all persons be dealt with identically. If there is some reasoneable basis for the recognition of separate classes, and the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to achievement of the State's objective; the separate treatment must admit of but one conclusion beyond a rational doubt, i. e., that the basis therefor is arbitrary and unreasonable, and without relevance to the legislative goal.

In *Walters v. St. Louis,* 347 *U. S.* 231, 74 *S. Ct.* 505, 98 *L. Ed.* 660 (1953), the court said:

Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary. (347 *U. S.* at 237, 74 *S. Ct.* at 509).

So here, there exists a logical, reasonable basis for placing plaintiffs' lands in a separate class or category from those other Carlstadt lands being presently serviced by the Joint Meeting. Plaintiffs' lands are used largely for commercial and industrial purposes — the Joint Meeting services a section used largely for residential purposes. The section of the municipality here involved has within the past decade been converted from a desolate area to a highly developed industrial area. The lands within the Authority district are meadow and marsh land requiring a much more expensive sewerage installation and an increased disposal cost. Because of a lack of a common system of sewage disposal, this development was accompanied by the pollution of waters in, bordering and entering the sewerage district. Many of the owners of improved properties within the confines of the present section are present or potential polluters of said waters. Septic tanks have been disapproved and individual disposal plants commanded by the State Department of Health. Construction of individual plants is too costly to be feasible. Accordingly, absent the type of sewage disposal provided by the Authority, both the idle and the improved lands would become non-usable because of the prohibitive cost of individually complying with the requirements of the State Department of Health. The availability of the Authority sewerage system will result in a special benefit to and will enhance the value of lands to be serviced by the Authority beyond any increment which may thereby be enjoyed by the balance of Carlstadt.

■ Thus the classification of plaintiffs' lands rests on real and not feigned differences and the action of the municipality in making a special charge for sewage disposal is constitutional.

## II

*Was the charge based on "capacity of improvement," i. e., area of building, improper due to the fact that it was not proportional?*

■ A "capacity charge," based on the area of the building alone, when employed as the sole basis of a sewer charge is invalid, as it does not bear the proper relationship to "type, class and amount of use and service." *N. J. S. A.* 40:14A–8(b). To that extent the trial court was correct. However, it does bear some relationship to those subjects and when combined in a formula which includes water consumption, constitutes one valid element upon which to bottom a charge. As so employed, the capacity charge is valid. We were informed at argument that the Authority has prepared a new schedule in the light of the trial court's opinion. The validity of the new schedule is not before us and we do not pass on that subject.

## III

*Are connection fees imposed on an annually increasing scale illegal and violative of N. J. S. A. 40:14A–1 et seq.?*

The authority of the Sewerage Authority to "charge and collect rents, rates, fees or other charges," is governed by *N. J. S. A.* 40:14A–8. *N. J. S. A.* 40:14A–8(b) (*L.* 1946, c. 138) provides in part:

(b) Rents, rates, fees and charges, which may be payable periodically, being in the nature of use or service charges, shall as nearly as the sewerage authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system, and may be based or computed either on the consumption of water on or in connection with the real property, making due allowance for commercial use of water, or on the number and kind of water outlets on or in connection with

the real property, or on the number and kind of plumbing or sewerage fixtures or facilities on or in connection with the real property, or on the number of persons residing or working on or otherwise connected or identified with the real property, or on the capacity of the improvements on or connected with the real property, or on any other factors determining the type, class and amount of use or service of the sewerage system, or on any combination of any such factors, * * *

*L.* 1946, *c.* 138 was supplemented by *L.* 1968, *c.* 317, § 2 by adding the following:

In addition to any such periodic service charges, a separate charge in the nature of a connection fee or tapping fee, in respect of each connection of any property with the sewerage system may be imposed upon the person making such connection or upon the owner or occupant of the property so connected. Such connection charges shall be uniform within each class of users but the amount thereof shall otherwise be entirely within the discretion of the authority in order that the combination of such connection fee or tapping fee and the aforesaid periodic service charges shall meet the requirements of subsection (c) hereof. *N. J. S. A.* 40:14A-8(b)

*N. J. S. A.* 40:14A-8(c) provides in part:

The sewerage authority shall prescribe and from time to time when necessary revise a schedule of such service charges, which shall comply with the terms of any contract of the sewerage authority and in any event shall be such that the revenues of the sewerage authority will at all times be adequate to pay all expenses of operation and maintenance of the sewerage system, including reserves, insurance, extensions, and replacements, and to pay punctually the principal of and interest on any bonds and to maintain such reserves or sinking funds therefor as may be required by the terms of any contract of the sewerage authority or as may be deemed necessary or desirable by the sewerage authority.

*L.* 1946, *c.* 138 was also supplemented by *L.* 1968, *c.* 317 § 2 by the addition of the following:

(d) Any county sewerage authority may establish sewerage regions in portions of the district. Rents, rates, fees and charges which may be payable periodically, being in the nature of use or service charges, shall as nearly as the sewerage authority shall deem practical and

equitable, be uniform throughout the district for the same type, class and amount of use or service of the sewage systems and shall meet all other requirements of subsection (b) hereof. *N. J. S. A.* 40:14A–8(d).

It is therefore seen that the purpose of the annual charge is to raise a sum sufficient to pay (1) all expenses of operation and maintenance and (2) the principal and interest on any bonds and to maintain reserves or sinking funds for the funding of the Authority debt. The former of these items has its genesis in the actual use of the system for waste disposal. The latter has its genesis in the original construction and installation costs, for which the bonds were issued and sold. The principal and interest on these obligations represent that cost.

It is apparent that there should be two sources from which to raise the funds required for said purposes in order that the charges remain "equitable" and "uniform." Those properties actually using the system should alone absorb the cost of "operation and maintenance," since the expenditures for such purposes arise solely from that use. On the other hand all properties, where service is available, whether actually using the system or not, should absorb the debt cost. The basis for this conclusion lies in the fact that the debt, as noted, represents the construction and installation expense, from which every property received some benefit and increase in value. Patently, part of the construction cost was necessitated by provision for adequate future service for unimproved properties as well as improved lands. It is conceivable that without the availability of an adequate sewerage disposal system that land might have to remain unimproved. That the actual users of the facility receive a benefit for which they should pay, is self-evident. It does not follow, however, from the fact that unimproved properties do not make any present use of the facilities, that they receive no present benefit therefrom. To the contrary, upon completion of installation, the unimproved properties also receive an immediate benefit from the mere avail-

ability of the system for service. All properties within the section serviced are beneficiaries of the expenditure — the improved for immediate present use and the unimproved for potential future use. Both classes receive an immediate enhancement in value from the mere existence of the system. The only equitable manner to distribute the original cost, is for the unimproved properties to bear part of that cost in exchange for the increment in value received and for the potential standby service. It is certainly not equitable for the improved lands, during their use of the system, to pay the entire original installation and construction cost, thereby paying for the present and future benefit received and to be received by the unimproved properties as well. There are, therefore, two categories of properties which should be fairly called upon to pay for the original construction cost, *i. e.*, the improved and unimproved properties.

The periodic rent, rate, fee or charge provided by *N. J. S. A.* 40:14A–8(b) deals with the charge to be made to the actual user of the system and does not contemplate a charge made against unimproved property. Yet the unimproved property is benefited by the improvement, as above noted, and more specifically the unimproved property will benefit unfairly with respect to so much of the capital cost and interest thereon as may have been paid in the past by users of the sewer. The statute does not authorize a special assessment or any immediate charge against a non-user, but the statute by amendment does authorize "a separate charge in the nature of a connection fee or tapping fee," and further states that "such connection charges shall be uniform within each class of users but the amount thereof shall otherwise be entirely within the discretion of the authority in order that the combination of such connection fee or tapping fee and the aforesaid periodic service charges shall meet the requirements of subsection (c) hereof," which subsection makes provision for funds not only for maintenance and operation but debt service as well.

■ The logical construction of the foregoing subsections is that the legislature intended that the installation and construction costs, *i. e.,* debt service charges, should in the first instance be financed by the actual users but should ultimately be borne by all the properties benefited, including the unimproved lands. For that reason there was provided a charge in the nature of a connection charge to be imposed upon unimproved properties in order that they assume a fair share of the original construction costs when they become improved properties.

■■ The Authority may, therefore, include as part of the connection fee a sum of money which will represent a fair contribution by the connecting party toward the debt service charges theretofore met by others. The statute need not be read to require precise mathematical equality, but rather to contemplate rough equality, keeping in mind that we are in an area in which, as with respect to other tax impositions, absolute equality is neither feasible nor constitutionally vital. The Authority may, therefore, in its discretion, prescribe a schedule of connection fees escalating with the passage of time, requiring a potential user to absorb a fair proportion of the sum theretofore paid by the actual users for principal and interest on the bonds.

Presumably the Authority had some such thought in mind in creating a schedule of connection fees. We cannot know whether the schedule of conection fees was prepared upon this thesis and hence express no view with respect to its reasonableness, but we do disagree with the trial court's determination that a schedule of connection fees is inherently unauthorized. The Authority should have an opportunity to prepare a new schedule in accordance with above approach.

IV

*Were the plaintiffs estopped or barred by laches?*

We find no merit in defendants' defenses of estoppel or laches.

Judgment modified in accordance with the foregoing.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANE-MAN—7.

*Opposed*—None.