119 N.J. Super. 212 (1972)
290 A.2d 753
THE TEAGEN COMPANY, A LIMITED PARTNERSHIP, AND THE WOODFIELD COMPANY, PLAINTIFFS,
v.
BOROUGH OF BERGENFIELD, IN THE COUNTY OF BERGEN, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided May 5, 1972.
*214 Mr. Jerome C. Eisenberg and Mr. Raymond A. Noble for plaintiffs (Messrs. Clapp & Eisenberg, attorneys).
Mr. Jack Geddy Goldberg for defendant (Mr. Pierce H. Deamer, Jr., attorney).
GELMAN, J.J. & D.R.C. (temporarily assigned).
In this action in lieu of prerogative writs plaintiffs challenge the validity of the practices of the Borough of Bergenfield with respect to garbage collection services provided by that municipality. They urge that the borough's regulations, such *215 as they may be, invidiously discriminate against them in a manner which offends the State and Federal Constitutions.
Bergenfield is a suburban community which, in common with many others in the metropolitan area, has experienced a rapid population growth since the end of World War II. The 1940 census fixed its population at 10,275; by 1970 the census figure had reached 29,000. Its population is housed primarily in one-family dwellings, but the borough also abounds in multi-family dwellings ranging from two-family houses to apartment complexes in excess of 600 dwelling units. There are more than 1,000 multi-family dwelling units located in multi-family buildings having in excess of six units. There is no evidence in the record to establish the total number of persons living in all multi-family dwelling units in the borough, but from the figures cited above it is clear that the number of persons who do so is a significant percentage of the borough's total population. In addition, the borough has within its borders over 400 commercial establishments and 22 industrial enterprises. See Census of Business Statistics,, 1967; New Jersey Industrial Directory, 1970.
Prior to March 1, 1949 garbage collection was accomplished by private scavenger under contract with the borough. The public bidding specifications for the contract years 1945, 1946 and 1949 have been submitted to the court and each set of specifications is identical insofar as here relevant. The scope of the work required under each was described as follows:
The work herein provided for includes the furnishing of all labor, equipment, vehicles, tools, implements, materials, and transportation facilities necessary for the collection and removal of ashes, garbage, and other refuse, more particularly described herein, from all houses, apartment houses, stores, schools, churches, buildings, premises, or properties situated within the Borough of Bergenfield, Bergen County, New Jersey.
Collections were on a twice-weekly basis, and the contractor was *216 * * * required to empty all receptacles placed between the sidewalks and curb, or in some relative position when there are no sidewalks or curbs, and when emptied the contractor shall re-place them carefully in the same place.
The borough paid the costs of the collection service directly to the contractor from general revenues raised in the usual manner.
This system was abandoned on March 1, 1949 when a municipal garbage collection system was instituted using borough employees and equipment. The expenses of collection have been and are now included in the borough's general budget, and hence these expenses contribute to the overall tax rate borne ratably by all property owners in the borough. At the present time the borough has eight garbage trucks and 23 or 24 employees are engaged on a full-time basis in garbage collection activities.
Apparently no ordinance or resolution has ever been enacted setting forth rules, regulations or conditions under which the service is extended to borough residents and property owners. The building inspector, who also doubles as the executive assistant to the mayor and council, has been a borough employee since 1936 and testified as to the "practices" the borough has pursued with respect to garbage collection. These "practices," as set forth in a printed card and newsletter distributed to property owners, may be summarized as follows: the borough collects any property owner's garbage which is left at the curb in an enclosed container not exceeding 20 gallons capacity or 75 pounds in weight. Refuse is also collected, but again only if placed at the curb in containers or bundles weighing not more than 75 pounds. The town is divided into two service areas, the line of division being the railroad tracks which run north-south and bisect the town. Each side of the town has garbage and refuse collection service twice a week. The borough's employees do not enter upon any private property to collect either garbage or refuse. Except for the container weight and size limitations, the borough's collection procedures are substantially *217 the same as when the service was provided by private contractors prior to 1949.
Plaintiffs are the operators of two sections of a garden apartment complex commonly known as Foster Village. The entire complex contains in excess of 600 dwelling units situated on approximately 28 acres. Plaintiffs are tenants under long-term leases of sections known as A and B, which together comprise 468 units located on approximately 23 acres. The evidence available indicates that the complex is bounded on the south by a public street known as Liberty Road, and that two other dedicated public streets, Howard Drive and Georgian Court, are located entirely within the complex itself. Liberty Road has a paved width of 36 feet, while Howard Drive and Georgian Court are 30 feet in width. There are also numerous paved parking areas throughout the complex, access to which is from the streets named above, as well as two other private streets, also located within the complex.
Foster Village was under construction at the time defendant instituted a municipal garbage collection service, and it was completed in 1950 or 1951. However, the borough has never collected garbage or refuse from any section of Foster Village. At all times since Foster Village has been in existence, garbage collection has been effected through private scavengers paid for by the various landlords who have operated and presently operate Foster Village. Between 1950 and 1969 the dweller-tenants of the complex placed their garbage in small in-the-ground receptacles located in front of their buildings. In 1968 a meeting was held between borough officials and plaintiffs' representatives to discuss complaints concerning the unsanitary conditions existing in Foster Village arising out of this method of garbage disposal. Following this meeting, and based upon the recommendations of the borough officials, plaintiffs changed over to the system now in use. At the present time Foster Village residents place their garbage and refuse in large metal, covered containers which serve as storage bins. Each container *218 has a capacity of two cubic yards, and sections A and B have 26 containers located in driveways and parking lots in their areas. The containers are emptied by a private scavenger, who uses garbage trucks equipped with a hydraulic lifting device to raise the containers for this purpose. The private scavenger provides collection service six days a week throughout the complex, and the containers are filled to capacity each day. At the present time plaintiffs pay the private scavenger for this service at the rate of $13,800 per year, this rate having been established on December 1, 1971. Prior to that time the annual rate was $10,560.
It is not disputed that the borough does not have hydraulic lifting equipment on its garbage trucks to accommodate the emptying of containers such as those used by plaintiffs. It was estimated that were the garbage of plaintiffs' tenants to be collected in the manner prescribed for municipal service, in excess of 900 and as many as 1200 garbage cans would would have to be placed at the curbs of sections A and B twice each week and that it would require one truck with three employees working one-half day for each collection.
Plaintiffs produced as an expert witness the private contractor who presently collects garbage and refuse at plaintiffs' development. He corroborated the details of the garbage collection procedures described above. He explained that trucks equipped with a hydraulic container lifting device require only two men per vehicle rather than three men used on trucks which are not so equipped and where the collection is at curbside from cans. He operates the same type of garbage collection trucks as does the Borough of Bergenfield, and the hydraulic container lifting device, which he has added to his trucks, can be added to the borough's trucks. He estimated the cost of installation at $1,200 per vehicle. He uses one truck with two men to collect the garbage at plaintiffs' premises and the collection from all 26 containers requires between one and one and one-half hours for completion.
*219 This contractor does work in several municipalities on a private contractual basis; his collection procedures include "backyard" and curbside service to one-family dwellings, as well as residential, commercial, and industrial service to customers who employ both ordinary garbage cans and large containers of the type used by plaintiffs. He expressed the opinion that the large container method is by far the most satisfactory for reasons of health and sanitation, and it is more economical to use because of the labor costs saved in collecting the garbage. However, it is impractical to collect from large containers at curbside, and where such containers are used his trucks must enter upon his customers' properties to make the collection. He has never experienced any difficulty in carrying out collection operations on his customers' properties.
From the foregoing recital it is evident, and I so find, that the borough never adopted any ordinance or officially promulgated any regulations prescribing the procedures and conditions for the collection of garbage and refuse since the inauguration of a municipal collection service in 1949. When the municipal service commenced in that year the prior rules in effect when the service was furnished by private scavengers were simply continued. While the absence of legislative action may not be in accordance with the legislative mandate, see N.J.S.A. 40:66-1; cf. Eckert v. West Orange, 90 N.J.L. 545, 548 (E. & A. 1917), that is not the issue here. The absence of any official imprimatur suggests only that the presumption of validity which attaches to legislative classifications or to regulations which are the product of a reasonably deliberative process is not available to defendant in this case.
The practical and inevitable consequence of the borough's method of collecting garbage only at curbside and from small, individual containers is to deny municipal garbage collection service to large multi-family dwelling complexes such as those operated by plaintiffs. Viewed from the standpoint of public health and safety, the borough's system is neither *220 feasible nor desirable. The placing of between 900 and 1200 garbage cans at the curbside in a relatively densely populated and compact area such as occupied by plaintiffs' complex would inevitably entail the spilling of garbage in and about the premises and lead to serious health and sanitation problems, not the least of which would be insect and rodent infestation. Indeed, it was precisely because of the existence of such problems when small, individual containers were in use that the borough requested plaintiffs adopt a different system of garbage storage.
The evidence establishes that the borough is in a position to furnish collection service in an efficient and sanitary manner with only a relatively minor[*] expenditure of moneys to equip one or two trucks so as to handle the large containers presently used by plaintiffs. Actually, by reducing the number of employees required on the trucks which are so equipped, the expenses of collection of garbage in this manner would be substantially less than collection under the conditions prescribed by the borough at the present time. Further, as the borough itself argued in opposition to plaintiffs' claim for monetary relief, it would be in a position to effect a higher tax revenue yield from plaintiffs' properties if garbage collection services were supplied by the municipality.
By reason of the fact that the borough insists upon adhering to garbage collection procedures which are inefficient, outmoded and not reasonably calculated to accomplish the objective of protecting the public health and safety, plaintiffs are deprived of this service. In Boulevard Apartments, Inc. v. Mayor, etc. Lodi, 110 N.J. Super. 406 (1970), the Appellate Division reviewed the legislative scheme and pertinent case law dealing with municipal garbage collection and concluded that:
*221 * * * Municipalities have wide latitude in determining the manner of control of garbage and their pertinent ordinances and resolutions, being entitled to the customary presumption of legislative validity, will not be upset unless palpably unreasonable. Dover Tp. v. Witt, 7 N.J. Super. 259, 262 (App. Div. 1950).
However, municipal legislation relating to garbage collection and disposal must be reasonable and not arbitrary or oppressive. 7 McQuillin, Municipal Corporations (rev. ed. 1968), § 24.245, at 87. Legislation limiting the collection of garbage to certain classifications is not forbidden. However, there can be no invidious discrimination in the establishment of such classifications. There is a denial of equal protection of the laws unless the service is available to all persons in like circumstances upon the same terms and conditions. Persons situated alike shall be treated alike. [at pp. 410-411]
In Boulevard the municipality supplied service through a private contractor, but the enabling ordinance expressly denied the service to privately-owned garden apartments while extending it to one-family dwellings as well as multi-family dwellings operated by the local housing authority. The Appellate Division concluded (at 411-412) that the legislative classification reflected in the ordinance was "unreasonable, discriminatory and invalid" because there is no rational basis or justification for differentiating between garden-type apartments and other residential dwellings. The court also noted that
* * * the cost of collection from family units in an apartment house where the accumulated garbage is concentrated in one spot to be picked up at the curb is unquestionably less than the cost of collection from an equal number of family units residing in separate private dwellings. [at 412]
The issue in the instant case, while cut of the same cloth, is of a different pattern. Here the municipality has what purports to be a total absence of any classification of property by type of use for garbage collection purposes but offers the service "equally" to all on the same terms and conditions. The question thus posed is whether the mere offer of an important and necessary governmental service to all upon the same terms satisfies the Equal Protection Clause where in actual fact the terms upon which the service is *222 offered negate its availability to a substantial segment of the community.
Mechanical formulations of equality are not the goal. As the United States Supreme Court noted in Baker v. Carr, 369 U.S. 186, 226, 82 S.Ct. 691, 715, 7 L.Ed.2d 663, 691 (1962):
* * * Judicial standards under the Equal Protection Clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects no policy, but simply arbitrary and capricious action.
Following Baker v. Carr, supra, the Supreme Court in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), held that legislative apportionment which accorded representation on the basis of governmental subdivisions, such as counties, but was unrelated to population, constituted a denial of equal protection. This was followed in New Jersey by Jackman v. Bodine, 43 N.J. 453 (1964), which invalidated, among other things, the provision of the New Jersey Constitution by which each county was represented by one senator in our bicameral Legislature. The New Jersey constitutional formula of one senatorial representative per county was "equal" treatment in the sense that the same representation was allotted to each such unit of government, but it did not constitute equality of representation in the exercise of the voting franchise which was deemed to be the standard required under the Equal Protection Clause.
Other analogies present themselves. Thus, the constitutional right to counsel now requires the government to assign to and pay the cost of counsel for indigent defendants so that the abstract constitutional right is equally available to all. See Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Likewise, states are required to furnish transcripts to indigent defendants so that they have equal access to appellate review of their convictions. *223 See Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, reh. den. 351 U.S. 958, 76 S.Ct. 844, 100 L.Ed. 1480 (1956). Here again the concern is not with a verbal formulation of equality but the assurance that what is supposed to be equal justice is equal in fact. Ibid., 351 U.S. at 17, 76 S.Ct. 585, 100 L.Ed. at 898. The same holds true when we are concerned with the right of access to a reasonably equal public education. See Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); Robinson v. Cahill, 118 N.J. Super. 223 (Law Div. 1972). In all of the cited instances the government was compelled to expend public revenues or to undertake comprehensive programs to effectuate a constitutional mandate.
The foregoing cases may be said to deal with the denial of what are deemed to be fundamental rights of citizenship, whereas the issue here is only the availability of local municipal services as to which a measure of flexibility is both necessary and inevitable. There is ample authority for the proposition that the taxpayer status does not compel identity of treatment in this area. See, e.g., Airwick Industries, Inc. v. Carlstadt Sewerage Authority, 57 N.J. 107, 116-118 (1970). However, where no attempt has been made to arrive at a classification based on real differences to support a difference in treatment with respect to municipal services, or where the grounds upon which the classification is made are irrelevant to the achievement of the end sought, the governmental action is wholly arbitrary and must be declared such. See Walters v. St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 98 L.Ed. 660, 665 (1954); N.J. Chapt., Am. I.P. v. N.J. State Board of Prof. Planners, 48 N.J. 581, 601, cert. den. 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967); Boulevard Apartments, Inc. v. Mayor, etc., Lodi, supra.
The New Jersey Legislature and our courts have long recognized that the collection and control of garbage are indispensable to the public health and safety. See Earruso v. Board of Health, East Hanover Tp., 120 N.J.L. *224 463, 469 (Sup. Ct. 1938); 7 McQuillin, Municipal Corporations, § 24.250, at 94. In 1970 the Legislature adopted the Solid Waste Utility Control Act, N.J.S.A. 48:13A-1 et seq., and stated in section 2:
The Legislature finds and declares that the collection, disposal and utilization of solid waste is a matter of grave concern to all citizens and is an activity thoroughly affected with the public interest; that the health, safety and welfare of the people of this State require efficient and reasonable solid waste collection, disposal and utilization service * * *.
In the face of this strong statement of the State's public policy, it is incumbent upon local government to utilize the most effective means of carrying out within its area of responsibility the legislative mandate. Where the means are readily available at a reasonable or, as here, a lesser expense to collect garbage in an efficient and more sanitary manner from large residential projects such as plaintiffs', the municipality cannot claim that it has made a good-faith effort to make this essential service available on a substantially equal basis by adhering to practices which are unrelated to and wholly arbitrary in view of the objective to be fulfilled. See Reynolds v. Sims, supra, 377 U.S. at 577, 84 S.Ct. 1362, 12 L.Ed.2d at 536; Reid Development Corp. v. Parsippany-Troy Hills Tp., 10 N.J. 229, 234 (1952); cf. In re Regulation F-22, Office of Milk Industry, New Jersey, 30 N.J. 335, 343 (1959).
The holding in this case, therefore, is that the borough shall henceforth be required to collect garbage at plaintiffs' premises and to take such action as may be necessary or appropriate to effect such collection from containers used by plaintiffs for the storage of garbage at the present time. Further, the borough shall amend its practices or regulations so as to authorize borough trucks to enter plaintiffs' premises for this purpose, provided that plaintiffs shall agree to indemnify and save the borough harmless from any claims arising out of such use of their premises by the *225 municipal vehicles involved. Nothing in the evidence adduced by plaintiffs suggests that the borough's practice of collecting garbage on a twice-weekly basis is either unreasonable or arbitrary, and the municipal collection services shall be furnished to plaintiffs' premises with the same frequency as made available to all other property owners.
Plaintiffs' claim for monetary relief will be dismissed. There is nothing in the record to show that they made any formal demand for garbage collection services from the borough prior to the institution of this action. As major taxpayers in this municipality, plaintiffs are charged with knowledge of the borough's garbage collection practices, and they obviously knew that they were not receiving this service. Nevertheless, in all of the years during which they had an interest in this matter, they never made a written demand upon the municipality that the service be extended to them. At most, there was a casual conversation or statement made at the meeting in 1968 concerning this subject, and this was never pursued in any formal manner until this action was brought. Plaintiffs always had available to them recourse to the courts to seek redress for their grievances, and even where the rights infringed are of a constitutional dimension, those aggrieved are barred from monetary relief where they have neither acted timely nor in an appropriate manner, which certainly was the case here. See Suburban Dept. Stores v. East Orange, 47 N.J. Super. 472, 480 (App. Div. 1957); cf. Myers v. Cedar Grove Tp., 66 N.J. Super. 530, 546 (App. Div.), rev'd on other grounds 36 N.J. 51 (1961); Jones v. Zoning Bd. of Adjust., Long Beach Tp., 28 N.J. Super. 483 (Law Div. 1953); Manobianco v. Hoboken, 96 N.J. Super. 273 (Law Div. 1967).
NOTES
[*] The current municipal budget (excluding school costs) is $3,529,636.52.