**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2661-15T2

TOWNSHIP OF HARDYSTON, a
Municipal Corporation of
the State of New Jersey,

    Plaintiff-Appellant,

v.

BLOCK 63, LOT 1.01, 3490 ROUTE
94, Assessed to BEAVER RUN
SHOPPING CENTER, LLC,

    Defendant,

and

SASS MUNI VI, LLC, through its
Custodian U.S. Bank,

    Defendant-Respondent.

_____

Argued May 17, 2017 — Decided August 3, 2017

Before Judges Alvarez, Accurso and Lisa.

On appeal from Superior Court of New Jersey, Chancery Division, Sussex County, Docket No. F-42162-14.

Susan C. Sharpe argued the cause for appellant (Dorsey & Semrau, LLC, attorneys; Fred C. Semrau and Ms. Sharpe, on the brief).

Robin London-Zeitz argued the cause for respondent (Gary C. Zeitz, LLC, attorneys; Amber J. Monroe, on the brief).

PER CURIAM

This is a tax sale foreclosure proceeding centering around an unimproved sixty-seven-acre parcel on Route 94 in Hardyston Township, which has contractually reserved sewer capacity in excess of 25,000 gallons per day. A prior owner, High Ridge Properties, LLC,[1] secured that allocation through an agreement with the Hardyston Township Municipal Utilities Authority (HTMUA), acting on behalf of the Township, which procured the capacity from neighboring Sussex Borough on the HTMUA's promise to pay for same.

Subsequently, High Ridge and the developer of the property, Beaver Run Shopping Center, LLC, filed two separate lawsuits challenging the quarterly "transmission fees" Sussex charged the HTMUA, which in turn charged High Ridge and Beaver Run, to maintain the allocation. High Ridge and Beaver Run alleged the fees were ultra vires because the property remained undeveloped, and thus the charges amounted to illegal user fees charged against unimproved property. The Law Division twice rejected those challenges, and in June 2012 entered a judgment in favor

---

[1] We refer to High Ridge as the owner of the property throughout for simplicity's sake.

of the HTMUA against High Ridge for $350,092 in past due sewer charges.

In addition to not paying its sewer charges, Beaver Run, to which High Ridge had transferred the property, was also not paying its taxes. In September 2011, plaintiff Township of Hardyston struck off tax sale certificate No. 11-19 to defendant Sass Muni VI, LLC, for $173,720.62 at zero percent interest. When Sass Muni instituted its action to foreclose its certificate in January 2014, it represented that all municipal taxes and other municipal liens against the property had been, or would be, paid current. Sass Muni joined the HTMUA as a defendant in order to foreclose the HTMUA's 2012 judgment lien.

Hardyston filed an answer in Sass Muni's foreclosure on behalf of the HTMUA, denying that all municipal taxes and other liens had been paid through the filing date of the foreclosure complaint. In its answer, the Township acknowledged its judgment but also averred it had municipal liens against the property for unpaid taxes and sewer charges.

Sass Muni eventually moved for summary judgment striking the Township's answer. Hardyston opposed the motion, contending its "$650,380.12 sewer charge lien" had priority over Sass Muni's tax sale certificate lien, and that "[n]o foreclosure judgment [could] be entered in [Sass Muni's] favor until all

municipal liens for municipal taxes and other charges have been paid." Sass Muni countered that Hardyston's lien "is merely a simple judgment lien, which does not arise out of the Tax Sale Law of New Jersey, it cannot be paid through the redemption process set forth in the Tax Sale, and cannot be foreclosed upon." Sass Muni asserted any judgment lien was "subject to [Sass Muni's] tax lien and [could] be extinguished in the instant foreclosure action." Hardyston replied "that notwithstanding the sewer charge lien exists in the form of a judgment against High Ridge Properties, LLC, it also exists independently in the form of Certificate No. 2013-001A in the name of Hardyston Township" in the total amount due of $547,149.43, excluding the quarterly charges from December 2012. Hardyston contended the total amount due on its sewer lien was $650,380.12, which Sass Muni declined to pay in 2013.

Judge McGovern granted Sass Muni's motion striking Hardyston's answer and permitting Sass Muni to proceed to final judgment upon "proof to the Hardyston Township Tax Collector that all municipal utility authority liens and obligations as well as all municipal tax liens and obligations have been satisfied." In a written statement of reasons, the judge addressed, and rejected, Sass Muni's argument that the HTMUA's

sewer lien was not enforceable under the Tax Sale Law, N.J.S.A.

54:5-1 to -137.  Judge McGovern wrote:

> [Sass Muni's] contention that HTMUA's
> sewer lien is not of the same type of
> municipal lien as its tax sale certificate
> is clearly contradicted by the Court in DSC
> of Newark Enterprises v. South Plainfield
> Borough, [17 N.J. Tax 510, 513 (Tax Ct.
> 1997)], where the [c]ourt places sewer
> charge liens within the category enforceable
> by the Tax Sale Law, N.J.S.A. 54:5-1 et seq.
>
> This [c]ourt is persuaded that under
> the holding in DSC of Newark Enterprises
> that the HTMUA lien belongs to the same
> group of liens as those which fall under the
> Tax Sale Law Statute and that they hold the
> same priority as the municipal liens under
> the Tax Sale Law Statute.  N.J.S.A. 54:5-1
> et seq.
>
> The offer of [Township of Hardyston] to
> resolve the lien dispute by Consent Order,
> to allow this matter to proceed as
> uncontested, is not required.  The [c]ourt
> finds that the statute, N.J.S.A. 54:5-99, is
> sufficiently clear on the issue.  The
> statute provides: "No foreclosure judgment
> shall be entered, except in cases where a
> municipality is the plaintiff[,] unless
> evidence is produced in the foreclosure
> action that all subsequent municipal liens
> have been paid to the time of the
> commencement of the action."  N.J.S.A. 54:5-
> 99.
>
> In her papers, counsel for [Sass Muni]
> acknowledges that, pursuant to statute, all
> open municipal charges must be paid prior to
> the entry of Final Judgment.  In oral
> argument on June 25, 2014, counsel for [Sass
> Muni] acknowledged and agreed that HTMUA's
> lien was superior to [Sass Muni's] lien and

> that [Sass Muni] is precluded from the entry of Final Judgment until all outstanding senior liens are satisfied.
>
> . . . .
>
> For the reasons stated herein, and for the reasons stated on the record on June 25, 2014, [Sass Muni's] motion for summary judgment as to liability is granted, and this matter may proceed to the Office of Foreclosure as uncontested.
>
> The granting of this motion is subject to the following condition:  Prior to Judgment being entered, [Sass Muni] must provide proof to the Hardyston Township Tax Collector that all municipal utility authority liens and obligations as well as all municipal tax liens and obligations have been satisfied.

Sass Muni did not proceed to final judgment in its own tax sale proceeding (presumably because of the express requirement that it satisfy all outstanding sewer charges).  In the absence of any action by Sass Muni to enter judgment on its tax sale certificate, the Township filed its own complaint to foreclose tax sale Certificate No. 2013-001A it acquired in 2013 in the principal sum of $480,166.24 for unpaid sewer allocation charges.  Sass Muni filed an answer and affirmative defenses, alleging as a junior lien holder its statutory right to redeem Hardyston's tax liens on the property pursuant to N.J.S.A. 54:5-54, and requesting dismissal of the suit with prejudice and a

determination of "the extent, validity and priority of the City [sic] of Hardyston's tax liens on the Property."

Following discovery, the parties filed cross-motions for summary judgment before a different Law Division judge. Hardyston argued that Sass Muni only filed an answer in order to delay the Township's foreclosure, thereby allowing Sass Muni more time to market the property. Sass Muni again pressed the argument that the Township's tax sale certificate was invalid because no sewer system had ever been constructed on the property. It argued that the Township's asserted tax lien was, in reality, no more than a Law Division judgment for breach of contract which could not be converted into a tax lien.

Hardyston countered "that this [c]ourt and two other [c]ourts have already established that satisfaction of all municipal utility authority liens and municipal tax liens, include the municipal sewer allocation charges." The judge granted the Township's motion and denied Sass Muni's. Accepting the Township's argument, the judge ruled that although Sass Muni "raises a significant legal issue concerning the validity of the [t]ax [l]ien," the law of the case doctrine prevented him from considering the issue anew.

Sass Muni moved for reconsideration, not only of the summary judgment in Hardyston's foreclosure but also the summary

judgment entered in its favor in its own foreclosure more than a year before, which required it to satisfy Hardyston's sewer allocation liens before entering final judgment. It argued that "the validity of the Hardyston [t]ax [l]ien was never challenged" in the Sass Muni foreclosure, and that it "has never been afforded its rightful opportunity to litigate same." Hardyston countered that the validity of its tax lien was litigated in the Sass Muni foreclosure, and that Judge McGovern considered and rejected the exact arguments Sass Muni reprised in Hardyston's foreclosure.

After two days of oral argument, the judge reserved decision. He framed the issue, however, as one of "conflicting loyalties," in the sense that "the township has this $400,000 that they're on the hook for with the county, and . . . Sass Muni's issue . . . [is] they spent over [$]200,000 on a piece of property. Now, suddenly, they're getting stuck with a bad deal that the township entered into with the developer." The judge subsequently issued orders on January 8, 2016, granting Sass Muni's motions for reconsideration in both the Sass Muni and the Hardyston tax sale foreclosures and invalidating Hardyston's sewer allocation lien. In a written decision accompanying the orders, the judge, relying on the Supreme Court's decision in In

re Passaic County Utilities Authority, 164 N.J. 270 (2000),

ruled that the Court had

> determined that authorized service charges
> are to be imposed only on users.  The
> rationale is that N.J.S.A. 40:14B-2(5)
> reiterated that all such services were
> provided "at the expense of the users of
> such services or of counties or
> municipalities or other persons contracting
> for or with respect to the same."  Although
> it is abundantly apparent that the
> unimproved property will benefit from this
> improvement, the actual improvement does not
> exist.
>
> This court has previously determined
> that it was foreclosed from considering the
> [Sass Muni] legal argument based upon the
> "law-of-the-case doctrine" in that Judge
> McGovern previously ruled that it must pay
> all past and future assessments.  However,
> it is clear that the nature of this lien is
> such that it is an invalid assessment which
> is not contemplated in the 2014 order of
> Judge McGovern.
>
> Based upon the foregoing the Hardyston
> lien/assessment is invalid.

Hardyston appeals.

We begin our analysis by noting the obvious, this is a somewhat unusual tax sale foreclosure proceeding, even leaving aside the various procedural irregularities attending it. Indeed, we think it may present a novel issue, albeit not one well-framed by the proceedings to date.  The dispute centers on Sass Muni's contention that High Ridge's contractually bargained

for sewer allocation charge does not qualify as a "sewer service charge" within the meaning of the Municipal and County Utilities Authorities Law (MCUAL), N.J.S.A. 40:14B-3(19) and N.J.S.A. 40:14B-22, and thus cannot become a lien against the property of the delinquent obligor under N.J.S.A. 40:14B-42. Although we do not question the general proposition Sass Muni asserts, that the MCUAL "'does not authorize a special assessment or any immediate charge against a non-user,'" Passaic Cty., supra, 164 N.J. at 293 (quoting Airwick Indus. v. Carlstadt Sewerage Auth., 57 N.J. 107, 121 (1970), cert. denied, 402 U.S. 967, 91 S. Ct. 1666, 29 L. Ed. 2d 132 (1971)), we are less convinced High Ridge can fairly be considered a "non-user" in light of the "pass-through" arrangement that apparently exists here.

As appears from the record, in 2002, High Ridge, the then contract purchaser of the property, sought the Township's assistance in acquiring sewer capacity for a shopping center High Ridge planned to build on the site. The Borough of Sussex was at that time auctioning off 25,000 gallons of excess sewerage capacity it maintained with the Sussex County Municipal Utilities Authority in order to "reduce its debt" to the Sussex County Authority and "eliminate part of any penalties" imposed pursuant to the Borough's contract with the Sussex County Authority.

High Ridge wished to acquire all 25,000 gallons for its shopping center.[2]  The terms of the auction, however, required bidders to come with a Letter of Intent from one of the Sussex County Authority's member municipalities "indicating its intent to be the actual purchaser of the allocation for the exclusive benefit of the [b]idder."  High Ridge thus entered into a January 2002 Agreement with the HTMUA, "acting for and on behalf of Hardyston Township," to serve as the host municipality in order to permit High Ridge to acquire Sussex Borough's 25,000 gallons of excess capacity.

The Agreement between High Ridge and the HTMUA provided that the HTMUA would be "the actual purchaser of the allocation for the exclusive benefit of [High Ridge]."  The agreement further provided that all monetary costs and fees for obtaining and maintaining the capacity, "including but not limited to professional fees, transmission fees, break-up fees, connection fees, as well as any other costs and fees incurred," would be the sole responsibility and obligation of High Ridge, which would "indemnify and hold harmless" the HTMUA "for all expenses, costs and obligations" incurred by the authority in furtherance

---

[2] The property already had reserved capacity of 10,000 gallons per day acquired in 1992 by High Ridge's and Beaver Run's predecessor in title.  High Ridge subsequently transferred 350 gallons of that reserved capacity to another landowner.

A-2661-15T2

of the agreement. Thus, although the record was not developed on this point, it appears the costs for the allocation the HTMUA billed to High Ridge, were costs the HTMUA was billed by Sussex Borough, which it, in turn, was billed by the Sussex County Municipal Utilities Authority.

Further, although we have been provided nothing more than the complaints and the judgments in the matters, High Ridge and its transferor Beaver Run, the developer of the shopping center, instituted separate Law Division actions challenging, unsuccessfully, the transmission fees Sass Muni complains of here. The 2010 complaint by High Ridge refers to even earlier litigation in 2004 in which Sussex Borough sued High Ridge in the Law Division "to collect unpaid 'transmission fees' from High Ridge." The 2010 complaint avers that the 2004 litigation was settled with an agreement "that High Ridge would pay quarterly transmission fees to the Borough in the amount of $10,630.54" based on an agreed methodology that "excluded the Borough's total treatment costs pursuant to its contract with [the Sussex County Municipal Utilities Authority], as High Ridge does not transmit any sewage through the Borough's sewer lines for treatment by [the Sussex County Municipal Utilities Authority]."

In addition to those documents, the appendix also includes a 1992 Developer's Agreement between the HTMUA and a prior owner of the property memorializing the grant of the 10,000 gallon sewer allocation for the property and the owner's commitment to construct a sanitary sewerage collection system on site, to be conveyed to the Authority upon completion. There is also a similar 2007 Sewer System Agreement between High Ridge and the HTMUA memorializing the 25,000 gallon allocation and High Ridge's commitment to construct a sewer system on the property to be conveyed to the HTMUA upon completion. In addition, in response to our question at oral argument as to whether the HTMUA was still making quarterly payments to Sussex Borough for the 25,000 gallons allocated to the property, Hardyston provided us a copy of a December 30, 2013 Agreement between Sussex Borough, Hardyston and the HTMUA relating to those payments and the sewer allocation.

Because none of this information was developed or explained in the trial court, we are unable to analyze its importance for the legal issue presented, that is, whether the unpaid charges are appropriately considered "sewer service charges" within the meaning of the MCUAL, N.J.S.A. 40:14B-3(19) and N.J.S.A. 40:14B-22, and thus properly a lien against the property under N.J.S.A. 40:14B-42. We are, however, unwilling to dismiss the

information as without significance to resolution of that question at this point in the proceedings. We are aware that municipal authorities have financed expansion of wastewater systems by selling allocated capacity to landowners desirous of ensuring sewer capacity for future development. See e.g., 388 Route 22 Readington Realty Holdings, LLC v. Twp. of Readington, 221 N.J. 318, 328 (2015). Although nowhere suggesting such arrangements are ultra vires, the Court in Readington never explained whether the payments for reserved allocation in such situations qualify as "sewer service charges" within the meaning of the MCUAL, N.J.S.A. 40:14B-3(19), N.J.S.A. 40:14B-22, and the principles laid down by the Court in Airwick, supra, 57 N.J. at 120-22.

The Airwick principles are straightforward. First is the understanding that the purpose of an annual sewer charge is to raise a sum sufficient to pay the sewerage authority's cost to (1) maintain and operate the system and (2) meet principal and interest on its bonds and any reserves for the funding of its debt. Id. at 120. As the Court explained, the first of these has its genesis in the actual use of the system and the second arises out of its original construction costs, for which the bonds were issued and sold. Ibid.

The second _Airwick_ principle is the recognition that every property within a sewerage authority's service area benefits by construction and availability of the sewage system, regardless of whether it is currently connected to that system. _Id._ at 120-21. Based on those pillars, the Court concluded that "[t]hose properties actually using the system should alone absorb the cost of 'operation and maintenance,' since the expenditures for such purposes arise solely from that use," but that "all properties, where service is available, whether actually using the system or not, should absorb the debt cost." _Id._ at 120. The Court concluded:

> The logical construction of the foregoing . . . is that the [L]egislature intended that the installation and construction costs, _i.e._, debt service charges, should in the first instance be financed by the actual users but should ultimately be borne by all the properties benefited, including the unimproved lands. For that reason there was provided a charge in the nature of a connection charge to be imposed upon unimproved properties in order that they assume a fair share of the original construction costs when they become improved properties.
>
> [_Id._ at 122.]

Thus the _Airwick_ principles are generally understood to require that the entire cost of constructing and operating a sewerage authority be fairly apportioned among those using the

15

system and those non-users whose properties are benefitted by the availability of sewerage capacity necessary to permit development. See Passaic Cty., supra, 164 N.J. at 293-94. As the Court explained in Passaic County, we interpret and apply the MCUAL guided by the principles in Airwick. Passaic Cty., supra, 164 N.J. at 292-94 (explaining that while Airwick was addressed to the Sewerage Authorities Law, N.J.S.A. 40:14A-1 to -45, the Court applied its principles to the MCUAL in White Birch Realty Corp. v. Gloucester Twp. Mun. Utils. Auth., 80 N.J. 165, 176 (1979), and they have since guided interpretation of that statute). Thus, those connected to the system pay for its operation and maintenance, as well as their share of the debt costs, and non-users, because not immediately benefitted by the system, make their fair share contribution to the authority's debt costs when they hook into the system in the form of a connection fee.

From those principles have come the holdings on which Sass Muni relies, that the MCUAL prohibits a municipality from charging annual sewage fees on unimproved property not using the sewage system. See id. at 300 (concluding "the overarching statutory scheme" of the MCUAL "is that the statutorily authorized service charges are to be imposed only on users"); Hamilton Twp. Mun. Utils. Auth. v. Apple Tree Corp., 202 N.J.

Super. 440, 443 (App. Div.) (holding that because the combination of service charges and connection fees is to be set at a level sufficient to run the system, a "'reservation of capacity' charge which exacts an amount in excess of the authorized service or connection charges is ultra vires"), certif. denied, 102 N.J. 327, 328 (1985). Neither of those cases, nor any other published authority of which we are aware, however, addresses a situation in which a landowner has specifically contracted with a municipal utilities authority for an additional allocation of sewer capacity the authority does not have, and thus must acquire from a different source, as High Ridge did here.

Sass Muni's assertion that non-users cannot be assessed a sewerage charge begs the question of whether a landowner who contracts with a municipal utilities authority to acquire and specifically reserve capacity the authority lacks and must obtain from another utility authority for a fee, is appropriately considered a non-user. It appears from the limited record we have before us that High Ridge, the owner of the unimproved property at issue here, may not fairly be considered a "non-user" applying the principles of the Airwick line of cases.

17

According to Airwick, supra, 57 N.J. at 120-21, all property owners in a sewer service area, regardless of whether their property is improved, "benefit from the mere availability of the system for service." Here, from our limited record, it appears the additional allocation purchased from the Sussex County Municipal Utilities Authority inures only to the benefit of High Ridge's unimproved property and provides no benefit to current users of the HTMUA. If High Ridge is receiving a current benefit from allocated capacity not available to other current users of the system, application of the Airwick principles would appear to require High Ridge to pay for that benefit to avoid unfairly burdening the current users of the HTMUA system.

The record does not permit us to resolve the question of whether High Ridge's contractually bargained for sewer allocation charge qualifies as a "sewer service charge" within the meaning of the MCUAL, N.J.S.A. 40:14B-3(19) and N.J.S.A. 40:14B-22, and is thus a lien against the property for which Sass Muni holds a tax certificate under N.J.S.A. 40:14B-42. We are simply without adequate information of the negotiations and agreements between the parties, the settlement of the 2004 litigation and the reasons behind High Ridge's and Beaver Run's

unsuccessful challenges to the transmission charges Sass Muni challenges here, and are thus left to apply the law in a vacuum.

Accordingly we remand to the Chancery Division, General Equity Part, where the matter should have originally been heard,[3] for further proceedings designed to ascertain the facts and apply the statutory law in accordance with the Airwick principles. Additionally, we take judicial notice of the "Rules and Regulations of the Hardyston Township Municipal Utilities Authority," especially sections 2.2, 2.4, 2.12, 4.1, 4.2, 4.5, and 5.4, as they apply to the property and the 2007 Sewer System Agreement, see Sections 16, 21, and 25.[4]  N.J.R.E. 201(a); N.J.R.E. 202(b).

We add but two final points. First, it is clear to us that the General Equity judge needs to consider both Hardyston's and

---

[3] Both Sass Muni's and Hardyston's tax sale foreclosures were heard in the Law Division for reasons unclear to us. Foreclosure being an equitable remedy, such actions should be filed and heard in the Chancery Division, General Equity, where the judges have developed considerable expertise in such matters.  See R. 4:3-1(a)(1).

[4] Neither party brought these regulations to our attention.  As they expressly address the 25,000 gallons of sewer capacity allocated to High Ridge, section 4.1; acquisition of capacity from other municipalities, section 4.2; sewer charges and fees, sections 2.2, 2.4 and 4.5, including interest on "unpaid developer allocation charges," section 2.12 and treatment of delinquent accounts, section 5.4; the HTMUA's regulations appear directly relevant to the issues to be resolved on remand.

Sass Muni's foreclosures on remand as these two cases have become inextricably linked by Sass Muni's decision to move for reconsideration of its favorable summary judgment decision in its prior foreclosure before the judge hearing Hardyston's foreclosure action. We need not dwell on the irregularity of such action. The matter should be addressed on remand by consideration of both matters. We do not agree that law of the case would apply here, as the Sass Muni foreclosure was an entirely different matter. See Sisler v. Gannett Co., 222 N.J. Super. 153, 159 (App. Div. 1987), certif. denied, 110 N.J. 304 (1988). Our review of the record, however, does not permit us to agree with Sass Muni that the validity of Hardyston's lien was not litigated and decided, rightly or wrongly, in Sass Muni's tax sale foreclosure proceeding. Thus collateral estoppel principles were certainly relevant, even though summary judgment in a foreclosure proceeding is not a final order. See Busch v. Biggs, 264 N.J. Super. 385, 399 (App. Div. 1993).

Finally, in the event the General Equity judge determines the unpaid sewer charges are not properly a lien against the property, the judge must consider whether the reserved sewer allocation must be revoked in this proceeding. There is no question but that "[a]ccess to sewer service is vital to any major development of property," 388 Route 22 Readington, supra,

221 <u>N.J.</u> at 326, and thus a prime determinant of a property's value.  The same principles Sass Muni relies on establishing that users of a sewer system can alone absorb the cost of its operation and maintenance, would seem to preclude burdening those users with the costs of sewer capacity reserved for non-users making no payment for same.  <u>Cf.</u> <u>Apple Tree</u>, <u>supra</u>, 202 <u>N.J. Super.</u> at 443.  Certainly, no tax sale final judgment should be entered without resolution of whether the sewer allocation remains with the property subject to the certificate.

Vacated and remanded for further proceedings not inconsistent with this opinion.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2661-15T2