WHITE BIRCH REALTY CORPORATION, PLAINTIFF-RE-
SPONDENT, v. GLOUCESTER TOWNSHIP MUNICIPAL
UTILITIES AUTHORITY, DEFENDANT-APPELLANT.

THE KORMAN CORPORATION, A PENNSYLVANIA COR-
PORATION, PLAINTIFF-RESPONDENT, AND WHITE
BIRCH REALTY CORPORATION, PLAINTIFF-INTER-
VENOR, v. GLOUCESTER TOWNSHIP MUNICIPAL
UTILITIES AUTHORITY, DEFENDANT-APPELLANT.

Argued February 6, 1979—Decided June 11, 1979.

*Mr. David Patterson* argued the cause for appellant (*Messrs. Maressa* and *Wade,* attorneys; *Mr. Joseph A. Maressa,* of counsel; *Mr. Patterson* and *Mr. Maressa,* on the briefs).

*Mr. William S. Greenberg* argued the cause for respondent The Korman Corporation (*Messrs. Greenberg* and *Mellk,* attorneys; *Mr. Ezra D. Rosenberg,* on the briefs).

*Mr. John A. Sweeney* argued the cause for respondent White Birch Realty Corporation (*Messrs. Dietz, Allen* and *Sweeney,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. At issue in these appeals is the reasonableness of the method of calculating the sewer connection fees charged two real estate developers by defendant Gloucester Township Municipal Utilities Authority (Authority), a municipal authority organized pursuant to the provisions of the Municipal and County Utilities Authorities Law, *N. J. S. A.* 40:14B–1 to 69. The trial court, finding that the connection fees charged were unreasonable, entered judgments for each developer. Upon appeal, the Appellate Division affirmed the judgment for one developer, but remanded that of the other for recalculation of the amount of its award. We granted the Authority's petitions for certification primarily to review the methodology used to compute the extent of the overcharges. 78 *N. J.* 403 (1978).

The Authority, originally created in 1958 as a municipal sewerage authority under *N. J. S. A.* 40:14A–1 to 37, was reorganized in 1964 as a municipal utilities authority pursuant to *N. J. S. A.* 40:14B–1 to 69. It commenced operations in 1963 when, with the receipt of a federal grant-in-aid of $611,000 and the proceeds from the sale of $3,490,000 principal amount of bonds (Series A Bonds), it acquired for approximately $620,000 two privately owned sewage collection and treatment plants and a municipally owned sewage

treatment plant. The balance of the funds, after payment of expenses and financing costs, was used for the repair of the two private systems, reconstruction of the municipal treatment plant, construction of a new sewage treatment plant and construction of about 45 miles of new collection mains. At this point in time the Authority was serving approximately 2200 customers.

The Authority's principal sources of revenue were twofold. First, there were service fees for providing sewerage service. These funds were available and used for meeting operating costs, satisfying bond interest and amortization, and paying for major repairs, renewals and improvements.

A second source of revenue was the connection charge assessed against new customers. This charge reflected not only the cost of tapping the sewerage main in the street and the cost of installing a lateral from the main to the curb, but also served as a basis for having new customers pay a part of the original cost of the plant. Under the terms of the bonds, the receipts from the connection charge were intermingled with the service fees and became a part of the general funds of the Authority. As such, they were in fact used for the same purposes as the proceeds of the service charges.

A customer's annual service charge depended on the number of service units ascribed to the nature of his usage. Single-family homes, each living unit of multi-family houses, and each rental unit of an apartment house were classified respectively as one basic service unit. Motels were scheduled at 3/5 of a unit for each rental unit, while restaurants were scheduled at three units for each seating capacity of 50. The initial annual service charge in 1963 was $44 per unit. This was increased to $50 in 1969 and $60 in 1971.

In 1963 the Authority charged $100 for a connection fee, provided the lateral pipe did not exceed a 6″ diameter. Whenever the pipe was of a larger size, the Authority would negotiate the amount of the fee. In 1969 the standard connection fee was increased to $200, and in July 1970 it was raised to $250. At this latter time, the provision for negotiable con-

nection fees for multi-family and nonresidential structures was discontinued, and the connection fee for a multi-family structure became $250 per living unit. In 1973 the residential unit connection fee was increased to $450.

Plaintiffs, The Korman Corporation (Korman) and White Birch Realty Corporation (White Birch), were two real estate developers in Gloucester Township. In 1969 Korman began construction of a development of single-family houses, townhouses, and garden apartments on a 370-acre tract. Between 1970 and the early part of 1974, Korman paid to the Authority $250,000 for about 1000 connections at $250 each.

White Birch's project consisted of approximately 200 single-family houses and 850 apartments. Between 1972 and 1975, White Birch paid for 361 connections at $250 each (total $90,250) and 425 connections at $450 each (total $191,250), or a total of 786 connections at a cost of $281,500.

In August 1972 Korman filed this suit against the Authority asserting, among other things, that it had been subjected to discriminatory treatment in that other developers had paid lower connection fees, and that the connection fees were arbitrary, capricious, unreasonable and unlawful. Korman sought declaratory and injunctive relief as well as a refund of the connection fees which it had paid.

In November 1973 White Birch, making similar charges, sought to intervene as a plaintiff. Its motion was granted. However, when the trial commenced in July 1974, White Birch's cause of action was severed when it was not prepared to move its case.

The *Korman* proceedings clearly established, and the trial court held, that the Authority unjustifiably discriminated among prospective customers until at least the implementation of its July 1970 rate schedule which eliminated negotiations in fixing connection fees for laterals. Other Korman claims for reimbursement for the cost of certain facilities were held to be premature or were dismissed on the merits by the trial court. These determinations were subsequently affirmed by the Appellate Division and are not before us.

The remaining question and the one with which we are concerned is the relationship of the amount of the connection charge to the connector's fair share of the construction cost theretofore paid by prior users. All parties and both the trial court and Appellate Division accepted the principle enunciated in *Airwick Industries, Inc. v. Carlstadt Sewerage Auth.*, 57 *N. J.* 107 (1970), app. dism. and *cert.* den. 402 *U. S.* 967, 91 *S. Ct.* 1666, 29 *L. Ed.* 2d 132 (1971), to the effect that a connector was obligated to pay his proportionate part of the cost of the system so that a new customer would stand on a footing comparable to existing customers.

Korman attempted to demonstrate that the Authority's connection fees were not calculated in accordance with the *Airwick* test. It produced as witnesses the Authority's members, counsel, engineers, and accountant. Their testimony made clear that the *Airwick* standards were not followed. For example, one former attorney for the Authority testified that the purpose of a connection charge was "[t]o provide funds for the Authority," and that he never "was called upon to consider that question for the Authority." A former member of the Authority testified that the $250 fee was used to discourage apartment buildings, and that the number was "picked" rather than calculated. The Authority's accountant indicated that, at least in 1970, the need for revenues and a comparison with rates charged by other authorities were the determinative factors.

Korman's principal expert witness was Kenneth White of the accounting firm of Price Waterhouse & Company. Under White's proposal the amount of past capital contributions was calculated by subtracting total operating costs from total service charge revenues from inception of the system on January 1, 1962 to date. That amount was then divided by the number of users on the line at the beginning of the year in question. The result was said to equal the contribution previously made by users for amortization and interest on the debt. Predicated on what he conceived to be the re-

duction in the Authority's debt before the respective Korman units were attached, he calculated that Korman had overpaid $130,262. His breakdown was tabulated as follows:

| Year Ending February 28 | Number of The Korman Corporation's units connected | Connection charge paid | Proper connection charge | Over-payment |
|---|---|---|---|---|
| 1971 | 100 | $250 | $115.15 | $ 13,485 |
| 1972 | 470 | 250 | 111.65 | 65,024 |
| 1973 | 170 | 250 | 120.84 | 21,957 |
| 1974 | 261 | 250 | 135.84 | 29,796 |
| Total overpayment | | | | $130,262 |

The Authority's expert was Herbert Krugman. He determined that the new plant and improvements to be made with the proceeds of the bond issue would increase the system capacity so that an additional 5500 service units could be added. Excluding the $417,000 expended by the Authority for the private facilities existing in 1963 when the Series A bond issue was floated, he applied the balance of the proceeds from the bond issue, $3,073,000 to the contemplated 5500 additional service units and found that each new unit would entail a capital cost of $558. Since the interest on the bulk of the Series A Bonds was 4-1/2% per annum, Krugman computed the connection charge by assessing to each connector compound interest on $558 at 4-1/2% per annum from 1963 to the date of connection. In this manner a customer who came on the line in 1973 would be charged with $309 in interest. To that figure would be added $100, the connection fee which the Authority had charged its new customers in 1963 plus $60 per service unit which Krugman believed was equivalent to the per unit expenditure of capital improvements made after 1963. He thereby calculated that in 1973 a proper connection fee should have been $469. Utilizing this approach for each of the periods in question,

he concluded that the connection fees charged Korman were "reasonable."

The trial court found that the Authority's "past and present methods of calculating the connection fees have no rational support in fact and were based on arbitrary and capricious assumptions." It adopted the methodology and conclusions of Korman's expert, Kenneth White, and awarded damages of $130,262 with interest at 6% from the dates of the various overpayments. The trial court also held that "future connection charges should of course be based on the principles of *Airwick* [*Industries, Inc. v. Carlstadt Sewerage Auth.*, 57 N. J. 107 (1970)] and *S. S. & O. Corp.* [*v. Bernards Tp. Sewerage Auth.*, 62 N. J. 369 (1973)] and consistent with the principles expressed here, namely, an amount calculated to recover past capital costs from users as they enter the system on an equitable and sound accounting basis." In its judgment entered in December 1974, the court also ordered that:

From and after the date hereof, the defendant is to calculate all future sewer connection charges by dividing, at the beginning of each fiscal year, the number of units at that time into the total debt service paid from inception of the Authority to that date.

The *White Birch* trial did not begin until November 1975. Much of the same evidence was again adduced. One notable difference, however, was that White Birch did not accept the formula of Korman's expert, Kenneth White. White Birch's expert, Albert Weisskopf, proposed a method which resulted in connection fees which were *higher* than those calculated by White and closer to those charged by the Authority.

Weisskopf used a method in which he added the principal amount of the bonds issued ($3,490,000), the total interest contemplated over the life of the bonds ($4,349,446), and the total amount that had been paid into the Improvement Fund through February 28, 1973 ($670,074). This sum total of $8,509,520 was then divided by the number of con-

nections as of that date, 10,778. The resultant figure of $790 was considered to be the cost of facilities per connection. He figured that the annual charge required could be ascertained by dividing the $790 by 40 (the term of the bonds). This came to $19.75 per year, so that at the end of a ten-year period, a new customer should have been charged $197.50. To this figure Weisskopf added a credit for existing customers to the extent that they had paid more than $19.75 per year (*i. e.,* the amount paid in excess over operating expenses). In this manner Weisskopf calculated that proper connection charges for the years ended February 28 were:

| | | |
|---|---|---|
| 1971 — $162.56 | 1973 — $216.05 | 1975 — $231.62 |
| 1972 — 197.89 | 1974 — 216.05[1] | 1976 — 247.18 |

On this basis the White Birch damages were $103,668. However, the trial court fixed the damages at $169,806.43, apparently based on additional connections made after the trial.

The Authority again presented Herbert Krugman as its expert witness. However, the formula he proposed this time was somewhat different from that which he had proposed at the *Korman* trial. He started as before with the per capita cost of the Authority's investment in new plant and equipment, but he then calculated the annual payment necessary to pay off this investment over the life of the bonds. When a new customer was connected to the system, his fee would be the sum of the annual payments he had missed, plus interest compounded from the date of each missed payment. The theory was that the fees paid by each user in excess of operating and maintenance expenses, when discounted to present value by the interest rate of the bonds, should equal

---

[1]Beginning with the year commencing March 1, 1973, Weisskopf took into account the added debt and interest due to an additional borrowing of $1,825,000 used for improvements and increased capacity (4,000 more service units).

the Authority's per-unit investment in physical plant. As in the *Korman* proceedings, Krugman concluded that the fees being charged by the Authority were reasonable.

Krugman also presented, as a "second-best" approach, a method derived from that which the trial court had approved in *Korman, i. e.,* that of Kenneth White. Krugman's approach differed from White's in three respects. First, he used the average number of customers on line during the fiscal year, rather than the number of customers on line at the beginning of the year, as White had done. Second, he included revenues attributable to connection fees in his calculation of debt service. That is, he subtracted operating expenses from the total revenue derived from annual service charges and connection fees, in contrast to White, who had used only the annual service charges. Finally, he added an interest charge to the connection fee, equal to the accumulated amount of interest on each of the connection fees that had been levied in earlier years. He again found that the fees actually charged by the Authority were reasonable. The trial court adopted Weisskopf's method and awarded damages accordingly.

Upon review the Appellate Division affirmed the *Korman* judgment. With respect to *White Birch,* the court noted that the trial court had adopted an approach inconsistent with that utilized in *Korman* and so remanded that judgment for recalculation.

I

The Authority is a creature of the "municipal and county utilities authorities law," *N. J. S. A.* 40:14B–1 to 69, and its powers and limitations are found in that statute. The act permits the Authority to charge "rents, rates, fees or other charges (in this act sometimes referred to as 'sewer service charges') for direct or indirect connection with, or the use or services of, the sewerage system." *N. J. S. A.* 40:14B–22. These charges must be nearly as the Authority deems "practicable and equitable be uniform * * * for the same type, class

and amount of use or service of the sewerage system * * *." *Id.* It can be seen that the statute clearly authorizes the Authority to fix and collect a connection charge.

In *Airwick, supra,* Justice Haneman construed somewhat similar provisions in the "sewerage authorities law," *N. J. S. A.* 40:14A–1 to 37, to require that connection rates must be uniform for each class of users and that equitably each consumer should be charged with its fair share of the original cost of the system. He reasoned that every property, improved and unimproved, benefited by having the service available — an effect which enhanced the value of unimproved as well as improved land and that, when the connection was in fact made, the connecting party should pay its fair contribution "toward the debt service charges theretofore met by others." 57 *N. J.* at 122.

Subsequent to the *Airwick* decision, the Legislature amended the provisions in the municipal utilities authorities law so that they contained the identical language as in the sewerage authorities law. *L.* 1971, c. 298, § 1 (amendment to *N. J. S. A.* 40:14B–22). The purpose of the change was expressed in the statement attached to the proposed 1971 amendment which read "[t]his bill accords to Municipal Utilities Authorities the same authority with respect to sewer connection fees as was accorded Municipal Sewerage Authorities by an amendment to the Municipal Sewerage Authorities Law enacted in 1968 * * *." *Senate Bill* 2046 (1971). See *Canterbury Properties Inc. v. Mt. Laurel Mun. Util. Auth.,* 124 *N. J. Super.* 448, 456–457 (App. Div.), certif. den. 64 *N. J.* 157 (1973) (applying *Airwick* principles to municipal utilities authority). Accordingly, we find that the principles enunciated in *Airwick* are equally applicable to municipal sewerage authorities created under *N. J. S. A.* 40:14B–1 to 69.

We did not mean to imply in *Airwick* that the method of determining the fair contribution could be calculated only by ascertaining the debt service charges previously paid by the sewerage users. There may be any number of ways in

which a computation of a fair share can be fixed, and a utilities authority is free to adopt any one which will accomplish the result of fairly apportioning system costs among the users. Factual circumstances may justify or necessitate different methodologies. In *Airwick* the factual pattern concerned a new system and costs to be attributed to customers who joined that system; whereas here the Authority had 2200 customers at the outset, substantial monies had been spent for improvements before the developers came on the line, and ten years after its initial bond issue in 1963 it raised another $1,825,000 to expand two treatment plants and install two pumping stations so that another 4000 customers could be added to the system.

 As we have seen in this case, the experts have made several different proposals, the seeds of which embody plans which may be deemed reasonable. In the final analysis, this policy decision should be made by the Authority. Under these circumstances it is generally preferable, if upon judicial review a connection charge is found to be unreasonable due to the Authority's methodology, that the cause be returned to the Authority to correct the situation by adopting new or amended procedures.

██ Here the trial court was fully justified in finding that the connection charges were fixed during some period of time on a non-uniform basis and had been set during all periods without regard to a specific formula or plan to distribute the cost of plant equitably among all customers. It is only because these actions have been pending since 1972 that we have taken it upon ourselves based on the record to prescribe and apply a formula which is fair and equitable so that the litigation can be concluded. *Cf. Paterson Redevelopment Agency v. Schulman*, 78 *N. J.* 378, 388 (1979) (Court will decide case on merits rather than remand where litigation continued for over four and one-half years and relevant facts appeared on the record). See also

*Hackensack Water Co. v. Borough of Old Tappan*, 77 *N. J.*
208 (1978).

## II

Before turning to the details, some consideration should
be given to the right of real estate developers to recover for
excessive connection charges which may have been passed
on to the purchasers of the homes. In *Deerfield Estates, Inc.
v. Tp. of East Brunswick*, 60 *N. J.* 115 (1972), a case
involving the obligation of a municipality to extend its water
mains for a private developer, Justice Mountain pointed
out that when the expense is imposed on the developer, the
ultimate costs would be passed on to the purchaser of each
tract of land. *Id.* at 131–132. In *Colonial Oaks West, Inc.
v. Tp. of East Brunswick*, 61 *N. J.* 560 (1972), in an action
by real estate developers against the Township for reim-
bursement of costs for installing water mains and making
physical connections to water mains, Justice Jacobs reminded
us that

[i]n determining the fairness and equitableness of the imposition,
the primary concern is with the purchaser * * * for it is generally
assumed that the developer includes the water main expense as an
item in fixing his selling price.

\* \* \*

On the remand, the Law Division will take testimony * * * with re-
spect to the issue of whether the costs incident to the water mains
were passed on by the developers here to the purchasers; in the
likely event that they were then * * * any recoveries by the develop-
ers of such costs would justly be placed in trust under suitable
court directions awaiting formal claims by the purchasers; and if
the purchasers fail to assert their claims the laws of escheat will
in time be applied. [61 *N. J.* at 565–566]

See also *Divan Builders, Inc. v. Wayne Tp. Planning Bd.*, 66
*N. J.* 582, 599 (1975); *S. S. & O. Corp. v. Bernards Tp.
Sewerage Auth.*, 62 *N. J.* 369 (1973).

These principles are equally applicable to the sewerage
connections made with systems owned and operated by

municipal utilities authorities. If a developer has included the connection fee as a cost element in pricing the house, his recovery would operate as a windfall paid for by the authority's customers, some of whom would have already borne the cost in the price of the house purchased from the developer. Clearly, such a result would be inequitable.

 Here neither the Authority nor the trial court discussed this issue. The *Korman* record is silent with respect to the pricing of the houses or apartments. There is some incidental reference in *White Birch* that the $200 increase in the connection fee effective July 1, 1973 was not passed on to consumers. The question not having been raised, explored on the record or considered below, we shall decide this case irrespective of that issue. We do expect in the future, however, that authorities, being governmental bodies acting on behalf of their customers, will investigate and, if warranted, raise this issue.

### III

As noted above, the trial court in the *Korman* proceeding adopted White's method of ascertaining the correct connection charge and in the *White Birch* trial it accepted Weisskopf's approach.[2] Neither White's nor Weisskopf's calculations are satisfactory.

As previously described, White calculated the amount of past capital contributions by subtracting total operating costs from total service charge revenues. He computed paid debt service to be $783,030 as of February 28, 1970. A major flaw in this calculation is its failure to recognize that the amount actually paid and dedicated for debt service as of that date was $1,348,109. The reasons for this substantial

2We note that connection fee refers to the capital contribution to be made by the new customer for the privilege of tying in to the existing system and not the actual cost of the tap and the lateral from the main to the curb or property line.

difference are twofold. First, the White method ignores the dollars the Authority had received for connection fees. In the 10-year period commencing with 1963 these exceeded $900,000 and accounted for 21% of all revenues in that period. Second, under the terms of the bond resolution and the bonds, all monies received, whether from service charges or connection fees, were deposited with a bond trustee who in turn placed these sums into various funds. Examination of the terms of the bonds is necessary in order to understand the functions of the respective funds. Some of the Series A Bonds had maturities between 1970 and 1986. The principal amounts of those maturities varied. These respective due dates are important because the Authority had to have sufficient funds on hand to meet these requirements on March 1 of each year. The schedule of maturities was as follows:

| Year | Principal Amount |
|------|------------------|
| 1970 | $ 5,000 |
| 1971 | 5,000 |
| 1972 | 15,000 |
| 1973 | 20,000 |
| 1974 | 30,000 |
| 1975 | 45,000 |
| 1976 | 60,000 |
| 1977 | 65,000 |
| 1978 | 70,000 |
| 1979 | 70,000 |
| 1980 | 75,000 |
| 1981 | 75,000 |
| 1982 | 80,000 |
| 1983 | 85,000 |
| 1984 | 90,000 |
| 1985 | 90,000 |
| 1986 | 95,000 |
| 2003 | 2,515,000 |

Further, the Series A Bonds were subject to sinking fund requirements commencing in 1987. Under those terms the Authority had to have available sufficient funds to redeem bonds in each fiscal year (twelve months ended February 28), in the following principal amounts:

| Year | Principal Amount |
|------|------------------|
| 1987 | $102,000 |
| 1988 | 106,000 |
| 1989 | 111,000 |
| 1990 | 116,000 |
| 1991 | 121,000 |
| 1992 | 127,000 |
| 1993 | 132,000 |
| 1994 | 137,000 |
| 1995 | 144,000 |
| 1996 | 150,000 |
| 1997 | 158,000 |
| 1998 | 165,000 |
| 1999 | 173,000 |
| 2000 | 181,000 |
| 2001 | 189,000 |
| 2002 | 197,000 |
| 2003 | 206,000 |

Six funds were specified for different purposes and monies once placed in a fund could be used only in a certain manner. The Authority's revenues were deposited in a Revenue Fund. Every three months, the Trustee transferred these monies into the other five funds in a particular order. After payments into an Operating Fund, proceeds of which were used for operating expenses, the next three priorities were the Debt Service Fund, Sinking Fund, and Debt Service Reserve Fund. These three funds and a part of the General Fund designated as the Redemption Account were dedicated to the payment of principal and interest of the debt. The Debt Service Fund had to contain an amount sufficient to pay the next interest payment due on the bonds plus the principal amount of the bonds due at the next quarter. In the Debt Service Reserve Fund there was to be retained an amount equal to 10% of the quarterly debt reserve requirement. Monies deposited in these funds could be utilized directly or indirectly only for the payment of interest and principal (including redemption) of the bonds. These monies were frozen for these purposes and represented a reduction in the total (interest and principal) cost of plant paid for by the Authority's customers.

The General Fund had three accounts: an Improvement Account, a Redemption Account, and a General Account. The Improvement Account called for a minimum amount of $50,000 or such larger amount as the Consulting Engineer certified was necessary as a reserve for major repairs, renewals, improvements or betterments. After satisfaction of the Improvement Account the balance was to be divided equally between the Redemption Account and the General Account (this ratio was subject to modification by the Authority).

The Authority covenanted that its schedule of charges and fees would be set so that revenues would at all times be adequate (1) to pay all operating expenses, (2) to pay all bond interest and principal and sinking fund requirements which were due without recourse to the Debt Service Reserve Fund, and (3) in addition to provide in each fiscal year an amount equal to 20% of all interest on and maturing principal of all bonds paid or becoming due in that year. If the revenues were insufficient, then it was incumbent upon the Authority to modify the rate schedule so that the necessary monies were forthcoming.

Although mandatory sinking fund payments and redemptions did not commence until 1987, the Authority had retired $115,000 principal amount of bonds in 1971 and 1972. Obviously, this reduction in debt represented a part payment of the capital cost of the plant. White's calculations did not take into account the redemption of these bonds.

· In addition to its failure to acknowledge the bond term requirements, the White calculations assumed that the number of customers added each year was equal to the number of connection permits issued by the Authority. However, neither number was the same as the number of service units connected to the system. Service units are to be differentiated from the number of customers and connection permits. As previously noted, a connected one-family house constituted one service unit and a restaurant seating 50 or less was three.

Accordingly, it would be more appropriate to have determined the unit charge on a per service unit basis. The difference has some significance. White used a number of 6800 as of February 28, 1970, when in fact the number of service units on the lines as of that date was 8303. It can be readily observed that the substantial differences in debt retirement, paid and dedicated, $783,030 as compared to $1,348,109 as of February 28, 1970, and the number of service units involved seriously flawed the White methodology.

Weisskopf theorized that each user paid the same amount toward reduction of capital cost each year and therefore that those who joined later pay for the past period. Simply put, he assumed that, if the plan cost $100 and a customer was to pay $10 per year for 10 years, a user who came on at the end of the first year should pay a $10 connection fee. The weakness in this approach is that it does not account for reality. It assumes equal payments of debt and interest over the life of the bonds, though the serial bond retirements were not scheduled equally. Nor were the same interest amounts due each year. Nor does this method account for bond purchases and redemptions prior to their maturity. More important than any of these considerations concerning Weisskopf's methodology is, as indicated in the Appellate Division opinion, the divergent charges which would prevail in the same time period if both White's and Weiskopf's computations were used. That result would be violative of the statutory requirement that the charges be uniform. *N. J. S. A.* 40:14B–22.

██ Having adopted the *Korman* methodology, the trial court should not have permitted relitigation of the identical question in a subsequent stage of the proceeding. We need not reach here the question of whether other interested persons who were not parties could be bound by the court's determination, since White Birch was a party and was bound even though it did not actively participate in the *Korman* phase of the litigation. *Cf. Pappas v. Santiago,* 66 *N. J.* 140, 144–145 (1974) (codefendant who obtained dismissal of

claims against her before issue of damages was tried would be bound on retrial by previous determination of damages even though she did not participate in the damage segment of trial). It would seem desirable, even though not required by statute, that an authority when revising its connection charges afford all interested persons an opportunity to be heard. Furthermore, upon judicial review better practice might be to notice all persons who have a sufficient interest in the proceeding. See *R.* 4:29–1(a).

We believe that a fair method to be applied under the circumstances here is to follow the *Airwick* suggestion of determining the debt service charges paid by customers before Korman or White Birch made their connections. Accordingly, we shall treat all payments into the Debt Service Fund, Debt Service Reserve Fund and Redemption Account of the General Fund as credits toward reduction of debt and interest. In doing so, we are aware that some monies paid into the Improvement Account may have been expended for betterments or improvements rather than repairs and normally the connector should pay his proportionate share of such betterment or improvements. However, the record does not disclose how much was expended for improvements vis-a-vis maintenance and repairs. For our purposes we have assumed these expenditures have fallen into the latter category.

Using the Authority's annual audit reports beginning with the fiscal year ending February 29, 1964, we have calculated plaintiffs' damages. These audits were made by Edmund D. Bowman & Co., certified public accountants, and their accuracy has been accepted by all parties. The damage computations appear in the tables appended to this opinion.

Plaintiffs are entitled to interest from appropriate dates to be determined by the trial court, and the matter is remanded to it to enter judgments for plaintiffs in accordance with this opinion.

*For modification and remandment*—Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER and HANDLER— 6.

*Opposed*—None.

# APPENDIX

TABLE 1

Debt Service Calculations

| Fiscal Year Ending 2/28 | Payments* into Debt Service Fund | Payments* into Debt Service Reserve Fund | Payments* into Re- demption Fund** | Total | Cumulative Total |
|---|---|---|---|---|---|
| 1964 | $238,765 | $ ---- | $ --- | $238,765 | $238,765 |
| 1965 | 74,698 | 215,785 | 1,460 | 291,943 | 530,708 |
| 1966 | 138,130 | 8,560 | ---- | 146,690 | 677,398 |
| 1967 | 170,157 | 8,560 | ---- | 178,717 | 856,115 |
| 1968 | 155,438 | 8,560 | ---- | 163,998 | 1,020,113 |
| 1969 | 155,438 | 8,560 | ---- | 163,998 | 1,184,111 |
| 1970 | 155,438 | 8,560 | ---- | 163,998 | 1,348,109 |
| 1971 | 165,430 | 18,613 | ---- | 184,043 | 1,532,152 |
| 1972 | 169,388 | 17,007 | 122,594 | 308,989 | 1,841,141 |
| 1973 | 210,471 | 20,468 | 40,614 | 271,553 | 2,112,694 |
| 1974 | 175,628 | 15,167 | 49,642 | 240,437 | 2,353,131 |
| 1975 | 176,402 | 16,094 | 26,782 | 219,278 | 2,572,409 |
| 1976 | 179,966 | 15,252 | 4,939 | 200,157 | 2,772,566 |

* Includes income on investments made with the monies in each fund.

** Excludes transfers from Debt Service Reserve Fund into Redemption Fund.

TABLE 2

Connection Fee Calculations

| Fiscal Year Ending 2/28 | Cumulative Debt Service Beginning of Year | Number of Service Units Beginning of Year | Connection Fee |
|---|---|---|---|
| 1971 | $1,348,109 | 8,303 | $162.36 |
| 1972 | 1,532,152 | 8,713 | 175.85 |
| 1973 | 1,841,141 | 9,635 | 191.09 |
| 1974 | 2,112,694 | 10,778 | 196.02 |
| 1975 | 2,353,131 | 12,071 | 194.94 |
| 1976 | 2,572,409 | 12,497 | 205.84 |

TABLE 3

Damage Calculations

| Fiscal Year Ending 2/28 | Actual Connection Fee | Calculated Connection Fee | Number of Connections | Damages |
|---|---|---|---|---|
| Korman | | | | |
| 1971 | $250.00 | $162.36 | 100 | $ 8,764 |
| 1972 | 250.00 | 175.85 | 470 | 34,850 |
| 1973 | 250.00 | 191.09 | 170 | 10,015 |
| 1974 | 250.00 | 196.02 | 261 | 14,089 |
| White Birch | | | | |
| 1972 | $250.00 | $175.85 | 144 | $10,678 |
| 1973 | 250.00 | 191.09 | 50 | 2,946 |
| 1974 | 250.00 | 196.02 | 167 | 9,015 |
| 1975 | 450.00 | 194.94 | 167 | 42,595 |
| 1976 | 450.00 | 205.84 | 258 | 62,993 |