192 N.J. Super. 376 (1983)
470 A.2d 31
TRUMP PLAZA CORP., T/A TRUMP PLAZA HOTEL AND CASINO; CLARIDGE LIMITED, T/A CLARIDGE HOTEL AND HI-HO CASINO, AND ADAMAR OF NEW JERSEY, INC., T/A TROPICANA HOTEL AND CASINO, PLAINTIFFS,
v.
ATLANTIC CITY MUNICIPAL UTILITIES AUTHORITY, A PUBLIC BODY POLITIC AND CORPORATE OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division Atlantic County.
Decided August 30, 1983.
*379 Thomas D. Ruane for plaintiffs.
Alfred A. Porro, Jr. John C. Matthews for defendant.
WILLIAMS, J.S.C.
Three casino developers have challenged the validity of a resolution adopted by the Atlantic City Municipal Utilities Authority establishing certain water-connection fees for projects receiving certificates of occupancy after January 1, 1981. The matter was submitted to the court upon a stipulated record.
The Atlantic City Municipal Utilities Authority (hereinafter referred to as "ACMUA") was created pursuant to the provisions of Section 5 a of N.J.S.A. 40:14B-4 by the passage of Ordinance No. 63 of 1978 by the Board of Commissioners of the City of Atlantic City. Thereafter, on January 22, 1980, pursuant to an agreement between it and the City of Atlantic City, the ACMUA purchased the water facilities owned by the Atlantic City Water Department. At that time, new customers of the ACMUA, pursuant to prior practice of the Atlantic City Water Department, were charged as follows:
a. $60 payable to the City of Atlantic City for a street opening permit.
b. An amount payable to the ACMUA based upon time plus material for the cost of service installation, including tapping sleeves, valves, lines, meters, etc.
c. Reimbursement to the ACMUA for the time expended in the inspection of large projects.
In December 1980, by Resolution No. 112-1980, the ACMUA enacted a connection-fee program which required payment of a water-connection fee by all projects receiving certificates of occupancy from Atlantic City after January 1, 1981. The fee was based on increased usage of water over 1980 levels and *380 comprised two parts: (1) a nonrefundable $1.00 per gallon of increased-usage charge for the first 100,000 gallons per day, and (2) a 5% surcharge applied to the total connection fee for each full year after January 1, 1981 that the fee was paid in full. A third part requiring a $2.00 per-gallon charge for all anticipated usage over 100,000 gallons per day, to be repaid to the customer through a 20% reduction in annual user charge until totally paid, was reserved.
On May 13, 1981, the ACMUA adopted Resolution No. 50-1981, which amended, in part, the connection-fee schedule of the ACMUA in the following respects: (1) the proposed $2.00 per-gallon over 100,000 gallons per-day connection charge was reduced to a $1.00 per-gallon nonrefundable charge for any project that was either commenced after June 30, 1982 and/or was completed (acquisition of a certificate of occupancy) after December 31, 1983, and (2) projects opening between January 1, 1984 and June 30, 1984 were required to pay a charge of $5,000 for all or any part of any month after January 1, 1984 prior to opening.
The connection fee adopted pursuant to Resolution No. 112-1980 was based upon time of receipt of certificate of occupancy rather than time of connection to the water system, connection being a prerequisite to issuance of a certificate of occupancy. The pre-existing charges for cost of service installation and inspection of large projects continue to be required and paid by new customers, in addition to the connection fees set forth in Resolutions 112-1980 and 50-1981.
Certain hotel/casinos, namely, Resorts International, Harrah's, Sands, Bally's Park Place, Caesars and Golden Nugget, were operating prior to the institution of the connection-fee program in question, and therefore were not charged the $100,000 connection fee. Claridge Limited presently operates the Claridge Hotel and Casino. Adamar of New Jersey, Inc., presently operates the Tropicana Motel and Casino. Harrah's Associates is presently constructing a hotel/casino scheduled for *381 opening in the first half of 1984. The Claridge Hotel, as a hotel, prior to expansion as a hotel and casino, was connected to the water system prior to December 1980, but required a new certificate of occupancy as a result of its expansion. Claridge and Harrah's Associates are defined by the ACMUA as Class 6 users, as are all other casino/hotels excepting the Tropicana, which is a Class 7 user.
Claridge Limited and Adamar of New Jersey, Inc., are subject to the $100,000 fee by the ACMUA pursuant to its connection-fee schedule and its terms. Adamar has paid the fee; Claridge has not. Harrah's Associates is also subject to the $100,000 fee and has paid same, and is also subject to additional charges of $1.00 per gallon for approximated daily use of water over 100,000 gallons should its casino/hotel not receive a certificate of occupancy before June 30, 1984. Should it receive a certificate of occupancy between January 1, 1984 and June 30, 1984, it is subject to a fee of $5,000 per month for each month that it did not have the certificate of occupancy.
For clarification of the issues involved, some review of the development of the law with respect to connection fees is necessary. The authority for a municipal utilities authority to charge and collect a connection fee is set forth in N.J.S.A. 40:14B-21, which provides in part:
In addition to any such water service charges, a separate charge in the nature of a connection fee or tapping fee, in respect of each connection of any property with the water system may be imposed upon the person making such connection or upon the owner or occupancy of the property so connected. Such connection charges shall be uniform within each class of users and the amount thereof shall not exceed the actual cost of the physical connection plus an amount representing the fair contribution of the connecting party toward the debt service charges on the bonds issued for the installation and construction of the water system previously paid by users of the water system, in order that the combination of such connection fee or tapping fee and the aforesaid water service charges shall meet the requirements of section 23 (C. 40:14B-23).
A similar statutory provision, N.J.S.A. 40:14A-8, was interpreted by our Supreme Court in Airwick Industries, Inc. v. Carlstadt Sewerage Auth., 57 N.J. 107 (1970). That provision was part of the Municipal Sewerage Authorities Law. N.J.S.A. *382 40:14A-1 et seq. Following Airwick Industries the Legislature amended provisions in the Municipal Utilities Authorities Law, N.J.S.A. 14B-1 et seq., so that they contained the identical language as the Sewerage Authorities Law. L. 1971, c. 298, § 1 (amendment to N.J.S.A. 40:14B-22). The purpose of the amendment as expressed in the statement attached thereto was to accord to municipal utilities authorities the same authority with respect to sewer-connection fees as was accorded to municipal sewerage authorities.
Thereafter in 1977 the Legislature again amended the Municipal Utilities Authorities Law with respect to charges for water. L. 1977, c. 441 (amendment to N.J.S.A. 40:14B-21). The statement annexed to the legislation provided in pertinent part as follows:
Senate Bill No. 69 authorize [sic] any county or municipal water and sewage disposal authority operating under the "municipal utilities authorities law," to charge a separate connection fee or tapping fee for any connections to the water system of such authority. The fees are to be imposed upon any person or persons contracting for such connections.
* * * * * * * *
The provisions of this bill are identical to those for sewerage connection or tapping fees charged by (1) sewerage authorities pursuant to P.L. 1946, c. 138 (C. 40:14A-8), as amended by P.L. 1968, c. 317, and by (2) municipal utilities authorities under (C. 40:14B-22), as amended by P.L. 1971, c. 298.
Thereafter, our Supreme Court held that the principles enunciated in Airwick Industries were equally applicable to municipal sewerage authorities operating under N.J.S.A. 40:14B-1 et seq. White Birch Realty Corp. v. Gloucester Tp. Mun. Util., 80 N.J. 165 (1979). Although White Birch dealt with sewerage charges, the court's rationale therein appears equally applicable to water charges authorized under the same act.
The purpose of the statutorily authorized "rents, rates, fees or other charges" was discussed at length in Airwick Industries. Justice Haneman noted that the purpose for annual charges of an authority was to raise a sum sufficient to pay all expenses of operation and maintenance, and to pay the principal and interest on any bonds, and to maintain reserves for the funding of the *383 authority debt. In order to keep charges "equitable" and "uniform" there should be two sources from which to raise the required funds. Only those properties actually using the system should be required to absorb the costs of operation and maintenance. On the other hand, it was recognized that all properties, whether improved and using the system or unimproved, benefitted from the system's existence. Therefore, all properties should bear part of the system's installation cost.
The applicable statute, N.J.S.A. 40:14A-8[b], provided only for charges against actual users of the system. It did not authorize a special assessment or any immediate charge against a nonuser. The statute did, however, authorize "a separate charge in the nature of a connection fee or tapping fee."
In construing these provisions, the court stated:
The logical construction of the foregoing subsections is that the legislature intended that the installation and construction costs, i.e., debt service charges, should in the first instance be financed by the actual users but should ultimately be borne by all the properties benefited, including the unimproved lands. For that reason there was provided a charge in the nature of a connection charge to be imposed upon unimproved properties in order that they assume a fair share of the original construction costs when they became improved properties.
Against this backdrop we now turn to the issues raised herein. In their complaint plaintiffs assert various bases for relief. Each will be dealt with in turn.

I

WHETHER THE CONNECTION FEES UNLAWFULLY DISCRIMINATE BETWEEN PRE-1981 CONNECTORS AND POST-JANUARY 1, 1981 CONNECTORS, IN VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT
Plaintiffs argue that the enactment of the ordinance which provides for a connection fee to be paid by those hotel/casinos connecting after 1/1/81 but which assessed no charge upon those which connected prior to 1/1/81 is discriminatory *384 and violates the Equal Protection Clause of the Fourteenth Amendment. The New Jersey Supreme Court has said:
... Equal protection does not require that all persons be dealt with identically. If there is some reasonable basis for the recognition of separate classes, and the disparate treatment of the classes has a rational relation to the object sought to be achieved by the lawmakers, the constitution is not offended. The transgression arises only when the classification rests upon grounds wholly irrelevant to the achievement of the State's objective; the separate treatment must admit of but one conclusion beyond a rational doubt, i.e., that the basis therefor is arbitrary and unreasonable, and without relevance to the legislative goal. [Airwick Industries, supra, 57 N.J. at 116, quoting N.J. Chapt., Am. I.P. v. N.J. State Bd. of Prof. Planners, 48 N.J. 581, 601 (1967), cert. den. 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967)]
Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary. [Airwick Industries, supra at 117, quoting Walters v. St. Louis, 347 U.S. 231, 237, 74 S.Ct. 505, 509, 98 L.Ed. 660 (1953)]
In this case plaintiffs have failed to support this allegation with any evidence from which the court can conclude that the designation of classes of users based upon considerations of time is arbitrary and unreasonable, and without relevance to achievement of the Authority's objective. The Atlantic City Municipal Utilities Authority was created in 1978 and did not acquire the water facilities of the Atlantic City Water Department until January of 1980. Prior to that time there had been no connection fee. It was not until 1977 that such a fee was statutorily authorized. L. 1977, c. 441.
The establishment of an effective date for such a fee is a reasonable and necessary step in implementation of a connection-fee program. If plaintiffs' argument were to be accepted, it would be impossible to ever initiate any connection-fee program in any amount, since there would always be users who were connected before the program began who were not charged a connection fee. Under such circumstances, distinguishing between projects already connected to the water system and those to be connected and in operation in the future *385 clearly has a rational relationship to the Authority's goal, and does not deny plaintiffs equal protection of the law.

II

WHETHER THE CONNECTION CHARGES ARE UNIFORM WITHIN EACH CLASS OF USERS UNDER N.J.S.A. 40:14B-21
Even though the Authority's classification of users does not offend equal protection, an issue is raised as to whether the charges are uniform within each class of users within the parameters of N.J.S.A. 40:14B-21. Other than the fact that pre-1981 casinos paid no connection fees, no evidence was offered to show what charges, if any, were paid by pre-1981 Class 6 and Class 7 users. As recognized in Airwick Industries, contributions toward construction may be received by both annual-use charges and connection fees. Plaintiffs' position, in effect, is that, since pre-1981 casinos paid no connection fees, application of such fees to post-January 1981 casinos results per se in a non-uniform fee within the same class of users.
A conceptually similar issue was addressed in Airwick Industries, where the court posed and answered the question of whether connection fees imposed on an annually increasing scale were illegal and violative of the applicable statute. In that case the schedule of connection charges for industrial/commercial users and residential users increased for each of three years measured from the date of availability of the system to the user. The court stated:
... The Authority may, therefore, in its discretion prescribe a schedule of connection fees escalating with the passage of time, requiring a potential user to absorb a fair proportion of the sum theretofore paid by the actual users for principal and interest on the bonds. [57 N.J. at 122]
The decision in Airwick Industries was followed in S.S. & O. Corp. v. Tp. of Bernards Sewerage Auth., 62 N.J. 369 (1973). The court stated that a higher connection charge assessable to new users of a sewerage system in order to reflect a fair *386 proportion of the sum previously paid by others for its cost was supported by prior New Jersey decisions. It also noted that a similar result had been reached in numerous other jurisdictions. 62 N.J. at 380. Although the connection fee was held invalid in S.S. & O. Corp., this was because it irrationally distinguished between "development" homes and similar dwellings in the community connecting within the same time period.
Here the evidence establishes that all post-January 1, 1981 projects in their respective classes have been treated uniformly. Further, it cannot be held that the mere fact that a pre-1981 casino paid no connection fee in and of itself results in a violation of N.J.S.A. 40:14B-21, requiring uniform connection charges within each class of users.
For the aforesaid reasons, plaintiffs have not carried their burden of demonstrating that the connection charges are not uniform within each class of users.

III

WHETHER THE CONNECTION FEE AS CALCULATED BY THE AUTHORITY IS VIOLATIVE OF N.J.S.A. 40:14B-21
The portion of N.J.S.A. 40:14B-21 applicable to this issue provides as follows:
* * * * * * * *
* * * Such connection charges shall be uniform within each class of users and the amount thereof shall not exceed the actual cost of the physical connection plus an amount representing the fair contribution of the connecting party toward the debt service charges on the bonds issued for the installation and construction of the water system previously paid by users of the water system, in order that the combination of such connection fee or tapping fee and the aforesaid water service charges shall meet the requirements of section 23 (C. 40:14B-23).
Prior to instituting the connection-fee program, the Authority commissioned certain studies. On the Authority's request, Kupper Associates did a study of and reported on the water-supply needs of the ACMUA, and recommended water-system improvements. *387 That report, dated October 22, 1980, was adopted by the Authority and was submitted in evidence herein. As a result of this report the Authority determined that its water-supply system was operating near capacity, particularly in summer months, and that substantial expansion of that system was necessary to accommodate new users.
In December 1980, the ACMUA retained Arthur Young & Co., C.P.A., to calculate the impact of six specific financing alternatives for expansion proposed by the Authority, based upon certain statistical assumptions made by it. This report was issued on January 30, 1981. Of the six alternatives analyzed by Arthur Young & Co., five involved proposals for financing the improvements by new users through connection charges in varying forms or a combination of connection charges and annual charges to be paid by new users. The sixth alternative considered was bonded debt alone. All of the alternatives considered related solely to financing future improvements. None involved analysis of what amount would reflect a fair proportion of the sum previously paid by users for the cost of the present system.
Based upon the aforesaid reports, the Authority adopted the initial and amended connection-fee schedule as set forth herein. The reason for establishment of the connection-fees program was unequivocably based on the need for the Authority to obtain new sources of water and service as a result of new customers such as plaintiffs. In the words of the Authority's executive director:
The timing of these projects is the ... essential reason in that they and not their predecessors were charged a connection fee. Simply put, the Authority could handle the original casino's [sic] needs and those charged a connection fee are being requested to contribute to the renovation and expansion of the Authority's facilities to meet the demands of the future.
The connection fee was established without respect to any formula involving the actual cost of physical connection plus an amount representing the connector's fair share of the construction costs theretofore paid by prior users. Neither party has *388 offered any evidence from which it could be determined what the amount of that fair share would be. At issue is whether the aforesaid approach by the Authority in calculating the connection-fee schedule accords with the requirements of N.J.S.A. 40:14B-21.
In White Birch Realty Corp. v. Gloucester Tp. Mun. Util., supra, the court held that N.J.S.A. 40:14B-21 did not establish a mandatory formula or methodology for calculation of connection fees. It was observed that the method of determining a connector's fair contribution was not limited to a calculation resulting from ascertainment of debt-service charges previously paid by system users. The court stated:
... There may be any number of ways in which a computation of a fair share can be fixed, and a utilities authority is free to adopt any one which will accomplish the result of fairly apportioning system costs among the users. Factual circumstances may justify or necessitate different methodologies. [80 N.J. at 176-177]
Nevertheless, while the court in that case indicated that a variety of methods of calculation of connection fees might be reasonable and appropriate in given circumstances, it recognized that such methods had to be rationally related to the purposes for which connection fees were statutorily authorized. The connection fees therein had been set without regard to any formula or plan to distribute the cost of plant equitably among all customers. As such they were held to be invalid.
In the present case the articulated purpose of the connection-fee program adopted by the ACMUA was to fairly apportion system costs for additional capacity and improvements among the new users. The rationale underlying this approach was that but for the new users there would be no need for additional capacity for the water system. The Authority argues that, since new users or connectors receive the actual benefit of the new construction, they should finance it. The problem with this approach is that it bears no relationship to the legislative purpose behind N.J.S.A. 40:14B-21 as interpreted in Airwick Industries, supra. That purpose was to distribute the costs of *389 construction of facilities fairly among all customers, since it was recognized that both developed and undeveloped properties benefit from the installation of the system.
While requiring new users to buy into the existing system through paying for an equitable share of its costs is contemplated by N.J.S.A. 40:14B-21, using the connection fee to fund future expansion and improvements is not. Recovery for the costs of such expansion is available by way of annual users' charges. Airwick Industries, supra.
It must be concluded, therefore, that the connection-fee schedule established by the ACMUA bears no rational relationship to the purpose for which connection fees are authorized by statute. As such, the fee schedule and the methodology employed to determine same cannot be sustained.
This does not mean, however, that the ACMUA cannot institute an appropriate connection-fee program for post-January 1981 connectors. Where, as here, a connection charge is found to be unreasonable due to the Authority's methodology, the matter should appropriately be remanded to the Authority for opportunity to correct the situation by adopting new or amended procedures. In doing so it is desirable that the Authority in revising its connection charges afford all interested parties an opportunity to be heard. White Birch Realty Corp. v. Gloucester Tp. Mun. Util., supra.

IV

WHETHER THE CONNECTION FEES CONSTITUTE AN IMPERMISSIBLE LOCAL ASSESSMENT
Plaintiffs also argue that the connection fees constitute an impermissible local assessment. A local assessment is one made on property specifically benefitted by a public improvement, rather than on the public generally. The theory of local assessments is of ancient origin, but the power to make such assessments must be conferred upon a local public entity by *390 constitution, statute or charter. See generally Gabriel v. Paramus, 45 N.J. 381, 383-85 (1965).
N.J.S.A. 40:56-1 et seq. authorizes New Jersey municipalities to levy local assessments, and provides them with the option of undertaking public improvements either by general or local assessment. However, municipal utilities authorities are not "municipalities" and are therefore not covered by N.J.S.A. 40:56-1 et seq. There is nothing in the municipal utilities law, N.J.S.A. 40:14B-1 et seq., or any other statute, authorizing a local authority to levy charges in the nature of local assessments. Instead, the authority is limited to determining rates with relation to the factors expressly contained in N.J.S.A. 40:14B-21, and in the form prescribed by that statute. Cf. Kline v. Bellmawr Sew. Auth., 55 N.J. Super. 153, 160 (Ch.Div. 1959), aff'd Landy v. Bellmawr Sew. Auth., 61 N.J. Super. 396, 399-400 (App.Div. 1960) (local assessments not authorized under sewerage authority law, N.J.S.A. 40:14A-1 et seq.). Accordingly, if the connection fees at issue here are deemed to be local assessments, then they would be beyond the statutory authority of defendant.
To the extent that new properties are required to fund the improvements to their properties through the connection fee, the fee takes on some of the characteristics of a local assessment. Nevertheless, the court does not feel that the parties have sufficiently developed the issue here to allow it to make an informed decision. Since this matter is to be remanded to the authority for adoption of an appropriate connection fee program, and since development of an appropriate fee structure should also resolve the local assessment question, the court sees no need to decide that question at this time.

V

MISCELLANEOUS
Plaintiffs' complaint also asserts as grounds for relief an allegation that plaintiffs and their predecessors relied upon *391 assurances from the Atlantic City Water Department that they could connect to the water system for a $60 permit fee and a $200 service-connection fee. Based upon the record herein, plaintiffs have failed to meet their burden of proof with respect to this issue.
Plaintiffs further allege in their complaint that the Authority has the power to issue bonds for the purpose of raising funds to pay for the cost of any part of the water system. It is argued that because of this the Legislature intended that bonds be the only method of financing such projects of the Authority. There is no support in law or in the record for this assertion.
This matter is remanded to the Atlantic City Municipal Utilities Authority for further proceedings consistent with this opinion.